# Staunton

## A. M. Morris, Jr., and Hope Tyson Morris v. The Children's Home Society of Virginia.

September 8, 1948.

Record No. 3421.

Present, All the Justices.

*Robert T. Barton, Jr., J. Brooks Mapp* and *William King Mapp*, for the appellants.

*Hunton, Williams, Anderson, Gay & Moore* and *Archibald G. Robertson*, for the appellee.

EGGLESTON, J., delivered the opinion of the court.

On May 24, 1947, A. M. Morris, Jr., and Hope Tyson Morris, his wife, pursuant to Code, section 5333b, as amended, filed their joint petition in the court below praying that they be granted leave to adopt Linda Ray Warthan as their child, and to change her name to Linda Morris. It was alleged that the child had been born on February 20, 1945, that she had been legally committed to the Children's Home Society of Virginia, a duly licensed child-placing agency, by which she had been placed in petitioners' home on May 3, 1946, and that she had since then lived there continuously.

It was further alleged that the petitioners were "financially able and morally fit adequately to maintain, care for and train" the child; that she was "suitable for adoption" by petitioners; and that her best interests would be promoted by such adoption.

The petition was accompanied by the written consent to the adoption of the Children's Home Society of Virginia (hereinafter called the Society), as required by Code, section 5333d, as amended.

Pursuant to Code, section 5333c, as amended, a copy of the petition was forwarded to the Commissioner of Public Welfare for his investigation and report.

Under date of August 20, 1947, the Commissioner filed with the lower court a written report of his investigation. The report stated, in substance, that the petitioners were aged forty-two and thirty-two years, respectively; that they had been married ten years; that they resided on and

operated a large and valuable farm in Accomack county; that through inheritance they had "other financial resources;" and that they possessed stability of character and were suitable persons to adopt the child.

Moreover, the report pointed out, Linda was found to be happy in her surroundings; that her proposed foster parents had previously adopted "a gentle, appealing little boy," approximately two years older than Linda; that Linda was "very attached to her brother," had "made a definite place for herself" in the home, and was "secure in her relationship with her foster parents and brother."[1]

Accordingly, the Commissioner recommended that a "final order of adoption be entered, omitting the interlocutory order and period of probation" required by Code, sections 5333e and 5333f, respectively, as amended.

Under date of November 3, 1947, the Commissioner filed with the lower court a supplemental report, reversing his former recommendation and recommending that the adoption be denied, the petition dismissed, and the child returned to the Society. The Commissioner stated that since his former report he had learned that the petitioners had separated, and that this situation and "the emotional relationship" which had developed in the Morris home were "contrary to the future welfare and happiness of the child." He further stated that because of this situation the Society desired "to withdraw consent to the adoption" and planned to remove the child from the Morris home. Despite the fact that the Society anticipated that the removal of the child would be "a very painful experience," the Commissioner deemed that to be "the only solution" of the problem.

On December 17, 1947, after due notice to the Society, the petitioners filed a joint supplemental petition, repeating the allegations in the former petition and praying that the interlocutory order required by Code, section 5333e, and the probationary period required by Code, section 5333f, be omitted, and that a final order be entered authorizing their

---

[1] Although the Commissioner's report makes no mention of it, the evidence shows that the Morrises have no children of their own.

adoption of the child and the change of her name to Linda Morris.

The Society appeared by counsel and filed an answer to the petitions opposing the adoption. No grounds were stated for the Society's position other than that the adoption was "against the best interests of said infant."

After having heard the evidence *ore tenus* the trial court entered a final decree or order, denying the prayer of the two petitions and directing that the petitioners return the child to the Society within fifteen days. To review the order and to stay its execution, an appeal was granted and a supersedeas awarded the petitioners.

At the hearing the Society's opposition to the adoption was grounded principally upon the marital difficulties which had arisen between the petitioners, resulting in their separation on July 12, 1947. It developed that on that date the petitioners had entered into a written agreement of separation adjusting their property rights. Mrs. Morris continued to live at the home with the two children, while the husband had withdrawn therefrom and was boarding in a near-by village.

Although the petitions prayed for a joint adoption of the child by the petitioners, the evidence, as well as the argument in the briefs on both sides, indicates that with the permission and consent of Mr. Morris, Mrs. Morris was to retain actual custody of the child.

The Society opposed this arrangement as contrary to the best interests of the child on two grounds: First, it said that long experience has demonstrated that a child needs for its normal development the united love, affection and care of both an adoptive father and mother. Consequently, the Society's fixed "policy" was not to place a child for adoption with a single person.

This position was supported by the testimony of Miss Loys Benedict, the Society's director of case work, a social worker of high qualifications and experience, whose opinion was clearly motivated by a sincere desire to do what she thought to be for the child's best interests.

While the Commissioner of Public Welfare concurred in this view, his opinion was admittedly based upon the rule or practice of his department "to follow the advice of the child-placing agency" in such a situation.

Next, the Society contended that Mrs. Morris lacked the necessary stability and strength of character which were conducive to the child's best interests. It pointed out that this is the second unfortunate marital experience which Mrs. Morris has had; that she had previously married at the age of eighteen, and that after a year and a half that marriage had terminated in a divorce.

Moreover, the Society said, Mrs. Morris should have disclosed to it, or to its visiting agent who called at her home in the summer of 1947, the fact that she and her husband had separated.

We shall first dispose of the Society's second contention. Evidently neither the Society nor the Commissioner of Public Welfare regarded Mrs. Morris's first marriage and divorce as an objectionable incident in her life, for had they taken that view they would not have consented to or recommended the adoption in the first instance.

Mrs. Morris's explanation of her failure to disclose her recent marital difficulties to the visiting case worker is quite natural and easily understood. She said that she did not intentionally withhold the information, but did not voluntarily disclose it because she regarded it as a matter in which the Society was not interested, since it never occurred to her that it might result in the removal of the child from her home.

The overwhelming weight of evidence refutes the contention that Mrs. Morris is not a suitable person to have the care and custody of this child. Twelve disinterested witnesses testified to her tender devotion for and her motherly care of the child and its foster brother, and to the little girl's normal development and happy life in the home. Five of these witnesess were mothers and intimate friends who had visited the home frequently. Other witnesses included a physician, a minister, and local business men. Not one

single witness in the neighborhood, not even the estranged husband, testified that Mrs. Morris was unfit or unsuitable to have the care and custody of the child.

While these witnesses admitted that they were shocked at the news of the separation, they were firm in the view that nevertheless the child should be allowed to remain with Mrs. Morris.

The only evidence to the contrary was the opinion of Miss Benedict, the Society's case worker, who had never visited the Morris home, and until the date of the trial had never seen Mrs. Morris and had never been in Accomack county.

It is significant, too, that after having heard all the evidence the lower court did not base its conclusion upon the unfitness of Mrs. Morris. On the contrary, in announcing its decision, it said of Mr. and Mrs. Morris: "Not one word of criticism have I of these parties personally."

The lower court based its conclusion to deny the petitions of adoption wholly upon the view that it would follow the recommendations of the Commissioner of Public Welfare and the Society that it was contrary to the best interests of the child that it be adopted in a home which had been broken up by the separation of the proposed foster parents.

All of the witnesses on both sides agree that the removal of this little girl, now three and one-half years old, from the care of her foster mother and from the association with the mother and the adopted brother will be a painful and distressing experience for her. The Commissioner of Public Welfare, in his report of November 3, 1947, recommending that the adoption be denied, characterized the proposed removal of the child from the Morris home as "a very painful experience." Some of the witnesses felt that the wounds occasioned thereby would never heal. Miss Benedict, while admitting that the removal would be "a distressing experience," thought that in time the child would become happily readjusted in a new home.

We need not stop to inquire whether under all of the

circumstances the trial court was correct in holding that because of the separation of the proposed foster parents, Mr. and Mrs. Morris, the petitions for adoption should have been denied. It appears both from the printed briefs and the oral argument before us that since the entry of the final order appealed from there have been developments which may have cured or corrected the deficiency in the foster home, namely, the lack of two parents living together in peace and happiness, which was the basis of the lower court's decision.

Since the trial below, Mrs. Morris, taking Linda and her adopted son with her, has returned to Connecticut where she was born and reared. She has obtained a divorce from A. M. Morris, Jr., has married J. Travers Ward, and has established a home and residence in Connecticut. Through her counsel she recognizes her obligation and asserts her readiness to return Linda to the jurisdiction of the lower court as the occasion may require.

In the reply brief filed on behalf of the appellants, Mr. Morris has authorized his counsel to state that he desires to withdraw from the adoption proceedings and "waives any legal claim to the child."

After the appeal had been argued and submitted, J. Travers Ward tendered to this court a petition confirming his marriage to the former Mrs. Morris and the establishment with her and the two children of a home and residence at Stamford, Connecticut. This petition alleges that Mr. Ward has "become devoted" to Linda, and desires to unite with his wife in jointly adopting the little girl.

The prayer of the petition is that he may be made a party to the cause and that it may proceed in the names and in behalf of his wife and himself, and that the proper orders may be entered allowing them to adopt the child and change her name to Linda Ward.

The Society has tendered an answer to this petition, opposing the adoption by Mr. and Mrs. Ward on the ground that it is against the best interests of the child. Moreover, the answer says, the Ward petition presents a case "which

is totally different" from that made out in the record before us, and lacks the necessary supporting evidence.

Manifestly, this petition and answer raise new issues and questions which were not involved in the record now before us. The underlying question is whether it will be to the best interests of the child to be adopted by Mr. and Mrs. Ward, who are now residents of the State of Connecticut. Under the statute this question cannot be decided until after the Commissioner of Public Welfare has made a further inquiry into the situation, and there has been a full hearing, with an opportunity of presenting evidence both in favor of and in opposition to the adoption. The fitness of the newly proposed foster father to share in the adoption and the suitableness of the new home and of the new married relationship must be inquired into.

The proper place for such an inquiry is, of course, in the trial court, and not in this, the appellate court. Consequently, the petition tendered to this court by and on behalf of J. Travers Ward, and the answer thereto tendered on behalf of the Children's Home Society of Virginia, are rejected, but without prejudice to these parties to assert their respective rights in the court below.

The decree or order complained of is reversed and the cause is remanded to the lower court with direction that leave be granted A. M. Morris, Jr., to withdraw from the adoption proceedings; that leave be granted J. Travers Ward and Hope Tyson Ward to file a joint petition for adoption of the child; that like leave be granted the Children's Home Society of Virginia to file its answer to the petition; that a copy of the petition be forwarded to the Commissioner of Public Welfare, as required by law; and that the lower court proceed to determine, in the light of the report of the Commissioner of Public Welfare and such evidence as may be adduced before it, whether it will be to the best interests of the child, Linda Ray Warthan, that she be adopted by J. Travers Ward and Hope Tyson Ward.

*Reversed and remanded.*