IN THE MATTER OF THE ESTATE OF JOHN A. GILLIES, DECEASED.

GUARANTEE BANK AND TRUST COMPANY, GUARDIAN AD LITEM FOR NICHOLAS G. GILLAS, A MINOR, DEFENDANT-APPELLANT, v. MARTHA GILLIES, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF JOHN A. GILLIES, DECEASED, PLAINTIFF-RESPONDENT.

Argued October 1, 1951—Decided October 29, 1951.

*Mr. Alfred C. Clapp* argued the cause for appellant (*Mr. Daniel J. Dowling* on the brief; *Messrs. Endicott, Dowling & Endicott*, attorneys).

*Mr. Harry R. Coulomb* argued the cause for respondent (*Mr. John Rauffenbart*, attorney).

The opinion of the court was delivered by

CASE, J.  The appeal is from a judgment of the Atlantic County Court, Probate Division, and was certified on our motion from the list of the Superior Court, Appellate Division. The judgment confirmed the order of the Surrogate of Atlantic County admitting to probate the last will and testament of John A. Gillies and issuing letters testamentary thereon to Martha Gillies, and determined that Nicholas G. Gillas is not entitled to any portion of and has no interest in the decedent's estate.

The controversy centers on the alleged adoption by the decedent of Nicholas G. Gillas under a decree of the Greek courts and the effect to be given to that decree in the distribution of the decedent's estate.

John A. Gillies and Martha Gillies were husband and wife, domiciled at Cologne, Atlantic County, New Jersey. Mr. Gillies' will, executed October 3, 1945, after giving $2,000 to his brother Nicholas, left everything to his wife, Martha Gillies. In the will was this paragraph:

"It is my wish and I hope that my said wife will adopt one of my nephews, a son of either Demitrios A. Gillies, or George Gillies, my brothers now living in Corinth, Greece, or, if it be her desire, a son of each of my said brothers, provided, of course, that said child or children are minors at the time of my decease, and that he or they will immigrate to this country and provide or procure the necessary consent or consents to his or their adoption by my said wife, to the end that the parents of said child or children shall be divested of all legal rights and obligations due from them to the said child, or from the child to them, and provided further, that the said child or children so to be adopted, by order in such proceedings, be awarded and shall adopt the surname of Gillies as and for their family name or names."

Nicholas G. Gillas is a son of the testator's brother George Gillas, named in the will as George Gillies.

John A. Gillies died at Clearwater, Florida, January 5, 1947. His will was probated in Atlantic County, New Jersey, January 20, 1947, and letters testamentary were issued to Mrs. Gillies. On September 14, 1948, the Guarantee Bank and Trust Company as guardian *ad litem* of Nicholas G. Gillas filed its petition in the Atlantic County Surrogate's Court seeking to set aside the probate and grant of letters. An order was made calling upon Martha Gillies to show cause why the prayer of the petition should not be granted. It was later enlarged to include the prayer that Nicholas be declared entitled as though John A. Gillies had died without a will. After hearing the judgment under appeal was entered.

The contention of the appellant is that the decedent, by a decree of the Corinth Court of First Instance in the Kingdom of Greece, dated August 29, 1946, in a proceeding initiated by him on March 22, 1946, adopted Nicholas George Gillas (whom we shall call Nicholas), 16-year-old son of the brother George, a resident of Corinth; that under our statute, *R. S.* 9:3–9, an adopted child becomes entitled on the death of the adopting parent to the same rights of inheritance and distribution as if born in lawful wedlock; that *R. S.* 3:2–15, providing that a will, made when a testator had no issue living wherein any issue he might have is not provided for or

mentioned, shall be void and the testator be deemed to die intestate if, at his death, he leave a child or issue, applies to an adopted child equally with a natural child, and that inasmuch as Nicholas was not mentioned in the will but was later adopted the decedent must be deemed to have died intestate and his property to have passed to Nicholas in the same manner and to the same extent as though the latter had been born naturally after the execution of the will and had not been provided for or mentioned therein. A copy of the decree was admitted in evidence, together with what is called an "official" translation. Our only knowledge of the contents of the decree comes from that translation.

The decree is the backbone of appellant's case. Without it the case falls; with it appellant may or may not prevail, depending upon various elements. Objection was and is made to the technicalities of proof, but we think that the decree, for what it is, is sufficiently authenticated. The effect to be given to it remains to be determined. It should be noted, however, that no copy of the full record, exemplified or otherwise, was offered in proof. We leave unanswered the *quaere* whether a mere recital in a decree that A. B., at the institution of a proceeding, was "present through his attorney-lawyer" and by his petition sought a proclamation of adoption, is everywhere conclusive by international comity of the proposition that A. B. actually brought the suit, regardless of the fact that he was then, theretofore had been, and thereafter remained, a domiciliary of another country and was not then or thereafter in the country where the petition was filed, the proceeding had and the decree rendered. (For a discussion of the right of a defendant to attack a foreign judgment in a suit thereon in this jurisdiction, see *Matera v. Hauptmann*, 13 *N. J. Misc.* 483 (*Sup. Ct. Circ.* 1935)). We have nothing but the decree itself, amplified by a declaration of consent, which we shall mention in detail, taken in New York. The declaration of consent may not be enlarged into a consent to jurisdiction.

On its face the decree proclaimed that the decedent did, as alleged, adopt Nicholas; but there are internal indications which point toward, or at least are not inconsistent with, the contention of respondent that neither she nor the decedent sought or knowingly consented to a Greek decree of adoption. Although the decree does not include a transcript of the proceedings, it does, with some fullness, show the course of them. It begins by stating that the applicant "John Athanas. Gillas" was "present through his Attorney-lawyer Agath. Panaghiotides" and that by his petition addressed to the court he asked "that Nicholas G. Gillas be proclaimed his adoptive son, in accordance with provisions of Articles 1632 and following of the Civil Code in force." That petition is not before us, and we have no knowledge of its existence or of its form or substance except from the recitals of the decree. There is no recital that it was signed by the applicant in person and there is no recital or proof that M. Panaghiotides, the attorney who undertook to file the petition, was working under authority from our decedent. Mrs. Gillies testifies that she received and filed her husband's correspondence and that she never saw any letter or envelope bearing the name of Agath. Panaghiotides. Decedent assuredly was not there in person. That is important because it is only by the allegations imputed to the petition that Gillies is brought in as a party to the cause. The efficacy of the petition is greatly impaired in that the prayer is alleged to have been for the proclamation of adoption "in accordance with provisions of Articles 1632 and following of the Civil Code." Theodore Sakellariadas, a citizen of Greece and the secretary of the Greek General Consulate in New York City, testifying in behalf of the present appellant as an expert in Greek law, said that the designated statutory provisions had no relation to the law of adoption and that the pertinent article was number 1576. Inasmuch as the Kingdom of Greece has no common law, and is, according to the proofs, strictly a code state, we fail to understand how the petition, so providing and remaining unamended, could be made the basis for a

judgment not comprehended by code sections upon which it rests. The extent to which the decree became potentially a judgment against Mr. Gillies may be measured by the reach of the remedy here sought, namely, the transfer of a major portion of his estate contrary to the provisions of his will. The thought may be expressed in another way: if the court at Corinth had jurisdiction to decree upon Gillies the relationship of adoptive father, effective here, then it had the authority, exercised by the same decree, to determine the applicability of our laws concerning the distribution and inheritance of decedent's estate, since our adoption laws and our distribution and inheritance laws are to be read together, and on the question of comity the two may not be severed. (On the general construction of our statutes from which this statement of the law is deducible see *In re Book,* 90 *N. J. Eq.* 549 (*E. & A.* 1919) and *In re Alter,* 92 *N. J. Eq.* 415 (*Prerog.* 1921)).

The next recital in the decree is that "Decision No. 206/46 of the said court was issued ordering as per contents of same." What that decision directed we do not know as the numerals are not met with again. Possibly they are a misprint for "Decision 208/46" which we next find stated as the authority for obtaining a "declaration which ought to be made in the presence of the Greek Consul General in New York of the United States of North America, appointed by the latter and aforesaid decision of the court as an introducing official for the case under consideration, by the applicant and his wife to the effect that they consent to adopt Nicholas G. Gillas * * *." The decree recites further proceedings in the Greek courts, including the taking of testimony there; also the receipt of a copy of the declaration, already mentioned, the incidents of which we shall presently discuss, taken before the Greek Consul General in New York which, according to the recital, showed that "the adopting party John Ath. Gillas and his wife Martha consent to adopt as their child Nicholas * * *." The conclusion of the decree is that the petition is accepted and that proclamation is made that Nicholas

is an "adoptive child of the applicant John Ath. Gillas * * *," "the applicant and his attorney being both absent." We are impressed by the fact that although the petition is said to have asked for a proclamation that Nicholas be the adoptive son of John, and the decretal portion directs that Nicholas is proclaimed the adoptive son of John, the references to the New York proceedings and indeed, as we shall see, the New York proceedings themselves, are consistent with, and in fact call for, a consent by John and his wife Martha that they shall be the adopting parents, namely, both of them, a procedure which is wholly inconsistent with the main purpose and the direction of the Corinthian decree that Nicholas be declared the adoptive son of John only.

We pass to the office of the Greek Consul General in New York, where Mr. and Mrs. Gillies went on July 8, 1946. The secretary, Sakellariadas, gave his testimony in English; but the transcript does not disclose ready familiarity with the spoken language. Indeed, the judge was constrained to remark—"It is difficult for us to understand you. There is nothing wrong. It would probably be difficult if we went to Greece for them to understand us." That interruption came, interestingly enough, at the point where the witness was relating that Mrs. Gillies did not understand Greek and that he had explained the contents of the paper to her in English. Perhaps the difficulty experienced by the court had also been experienced by Mrs. Gillies. The witness' explanation to Gillies was in both English and Greek. The odd thing is that, if the proceeding was one which Gillies had instituted and was prosecuting under the direction and advice of learned counsel, he, since he was of Greek origin and was familiar with the Greek language, should require either explanation or interpretation. The papers had been in Gillies' hands. He and Mrs. Gillies brought them to the consulate. The witness made the further statement that with those legal papers were personal letters from members of Mr. Gillies' family giving instructions. It is inferrible from the general proofs that the moving influence in the proceeding was not from Gillies at

all but from the Gillas family in Greece and that Mr. and Mrs. Gillies went to the consular office without comprehension on the part of either of them of the purport of the business.

Mr. and Mrs. Gillies signed two papers in the consulate. Both papers were written in Greek characters and were prepared there on that day while they waited. The first was addressed to "Honorable Consul General" and according to the translation stated as follows:

"Submitting to you the decision no. 208/1946 of the Court of First Instance of Corinthos, we are requesting you to accept us to make before you the declaration of consent ordered by the above decision, necessary to be done for the adaption of our nephew Nicholas George Gillias, residing in Greece."

It was signed as follows:

"Respectfully yours,
The Applicants
John Athan. Gillias
Martha John Gillias"

Omitting the blind reference to "decision no. 208/1946," there was nothing on the face of that paper which indicates that the objective was an adoption within and according to the laws of Greece or that the paper was not an incident to permissive immigration looking toward an adoption of Nicholas in this country after arrival here.

The second paper was a declaration of consent for adoption which was signed by Mr. Gillies and Mrs. Gillies as "declarants." It was signed also by the consul general and by the witness as "Judicial Secretary and Interpreter" and bore the seal of the consulate. It certified that in accordance with a named statute (referred to simply by number) Mr. and Mrs. Gillies appeared, produced a copy of Decision No. 208/46 of the Corinth Court of First Instance and "requested to make before us the declaration re their consent to adopt their nephew Nicholas George Gillias, actually a resident of Corinth, which declaration was made necessary to be done

by the appearing parties by the or*dna*nce of the aforesaid decision. \* \* \* Whereupon the above appearing parties John Ath. Gillias and Martha, wife of John Gillias, through her said interpreter, stated that they consent to adopt their nephew Nicholas George Gillias, a resident of Corinth of Greece, in accordance with the or*dna*nce of the decision referred to above." Decision No. 208/46 is not before us. Again, as to this paper, there is nothing on its face inconsistent with the respondent's contention.

Neither the papers themselves nor copies of them were forwarded by the consulate to the court. The originals were retained at the consulate and are still there. Copies of both papers were handed to Mr. Gillies to be forwarded and presumably went from him to his relatives in Greece and from them to the court at Corinth. It is to be observed that the adoption consented to was to be by both husband and wife. The consent was not to an adoption by the husband alone. Yet the decree proclaimed an adoption by John only, and the law of Greece, according to Sakellariadas, testifying as an expert, requires that the adoption sought to be effected by the decree must be consented to.

It is further stated by the witness that when Gillies came to the consulate on July 8 he brought a copy of a Greek decree, done in Greek, which ordered the taking of that declaration. That could not, of course, have been a copy of the decree, not yet issued or entered, proclaiming adoption. It may have been Decision No. 208/46 which is not in evidence; whether so or not the proof imputes no information to Gillies of an adoption in Greece as against an assisted immigration looking toward a proposed adoption here. Gillies was not in Greece after his will was executed. It is not shown that he, by any instruction or by any authority, whether direct or not, caused the adoption proceeding to be instituted. Reliance is on the bare assertions and provisions of a decree which is dependent for its efficacy upon a petition which does not support the conclusion, upon incidents which do not appear within its findings, and upon declarations taken, not

in Greece, but in this country, the originals of which are here, not there, the particulars of which are more fully before us than they were before the Greek court, and the execution of which, essential by the Greek law to the authenticity of the decree, was under a confusion by the declarants as to what they were declaring and by the interpreter, and therefore by the consul general, as to what they sought to declare.

The respondent testified that her husband, knowing that he was suffering from a serious bodily ailment, very much desired, with her concurrence, that after his death she should have a son to depend upon and that it would be well to have one of his nephews come from Greece to this country and live with them or her for a time so that if he be found a likable, dependable and altogether desirable person he be adopted here, and that all that either of them attempted to do was to pursue such a course as that, under the stringent immigration laws then in force, Nicholas could be brought to this country for that purpose; that the "consents" which they signed were understood by them to be consents that if Nicholas was given admittance to this country they would adopt him after becoming satisfied that he was suitable for adoption. There is much to indicate that Mr. and Mrs. Gillies here and the Gillas family overseas, together with the Corinth court under the suggestion of the Gillas family in Greece, were working at cross-purposes.

Some of these indications are factually demonstrated, some are inferences from facts. It is clear that on October 3, 1945, when the decedent solemnly inserted in his will the provision regarding adoption, quoted above, five months before the petition was filed in Corinth seeking adoption by him alone, he had in mind an adoption by his wife. There is hardly room for doubt that on June 25, 1946, which was in the midst of the Greek court proceedings—less than two weeks before the visit to the Greek Consulate in New York to sign "consents"—the decedent was seeking from the Department of State at Washington, a direction for the admission of a "nephew" into this country with the objective of adopting

him here, as witness this letter addressed to Mr. Gillies at Cologne, New Jersey, by the Chief of the Visa Division, Secretary of State's Office, Washington, under date of July 19, 1946:

"Sir:

The Department is in receipt of your letter of June 24, 1946 by reference from the Immigration and Naturalization Service of the Department of Justice further regarding your desire to have your nephew immigrate into the United States from Greece for the purpose of adoption.

\* \* \*

Your nephew should be advised to take up his case with the American Embassy at Athens which will advise him fully regarding the procedure to be followed in obtaining an immigration visa and will accord his case every possible consideration."

There is no suggestion that the nephew was other than Nicholas. It is quite incomprehensible that if Gillies was in the midst of a proceeding initiated by him in the court at Corinth for the actual and immediate adoption of Nicholas in Greece he would then be seeking information from the Secretary of State's Office as to the method of admitting him, as his nephew, to this country for the purpose of adoption here. The naturalization clerk at Atlantic County, acting also as special deputy county clerk, testified that in the fall of 1946—the date being recalled by relation to a letter dated October 11, 1946—Mr. and Mrs. Gillies came to see him for suggestions as to how they could get papers for the immigration from Greece of Nicholas, whom Gillies referred to as his nephew and not as his son. There is stronger and more specific testimony from relatives of Gillies whom the decedent and his wife visited in New York on the occasion of their call at the consular office on July 8, 1946, and again in November, about six weeks before the decedent's death. There is no indication that Gillies was informed of the making of the decree although it was signed and published more than four full months before he died.

On a consideration of all of the facts we have grave doubts of the jurisdiction of the court at Corinth to entertain the

suit and to render the decree. *Caruso v. Caruso,* 106 *N. J. Eq.* 130 (*E. & A.* 1929), is cited *contra,* but is not actually so, as a reading will readily disclose. However, we prefer to rest our decision upon a ground other than lack of jurisdiction in the court at Corinth. This for two reasons: partly because of the hesitancy all courts experience in finding adversely on jurisdiction in the courts of a friendly nation; but more largely because a substantial portion of the proofs which have influenced us point towards a fraud upon the foreign court, a phase of the case which was not set up in the court below and which, with some of the related incidents discussed above, has not been clearly developed here.

The foreign adoption has, nevertheless, another angle which prevents its enforcement here. It is in direct conflict with the public policy of this State in matters of adoption. *R. S.* 9:3–5 provides that a decree of adoption shall not be granted unless the child has been living continuously in the home of the petitioner or petitioners for not less than one year previous to the hearing of the petition; provided, however, that the court, if it finds that the best interests of the child so require, may in its discretion grant a decree of adoption after the child has so lived in the home for a minimum period of six months. Implicit within that statute is a public policy grounded in the protection of our institution of family life both for parents and for child, namely, that the considerable and solemn rights and obligations which follow upon adoption shall not be given or imposed without such a forecast of the personal contacts and impacts of parent and child as is to be had by a preliminary period of intimate living. The wisdom of that policy is manifested in this case. It is not shown that John Gillies ever saw Nicholas or that Nicholas ever saw John. It is certain that John's wife, Martha, respondent herein, never saw the youth. The young man is a Greek national and has never been in this country. If a letter written by him to the respondent may be interpreted as a fair reflection of his attitude, he is much more intent upon what the assumed relationship may mean to

him in money than upon any filial obligation of love, respect or allegiance toward the woman he claims as his foster mother; a state which, grounded in the entire lack of acquaintance-ship and of common interests, is not surprising but is none the less a complete justification for the policy which our Legislature has recognized and established. If the appellant's case is well founded, this young man, now turning 21, would, upon enforcement of the decree here, receive most of the estate which without a doubt the decedent meant should go to the latter's wife. The advantages which our statutes give to an adopted child and which Nicholas seeks to obtain are correlative with the clear, solemn and purposeful assumption of the mutual relationship of parent and child preceded by such foreknowledge of personal attributes and reactions as come only by daily living under normal conditions in the same household. Those concomitants of adoption, vital in our jurisdiction, were totally absent in this case. Such force as is to be accorded the decree comes, not from the full faith and credit clause of our Federal Constitution, but from international law or comity. The weight of authority in this country is that a child adopted in a foreign state or country may take under local statutes of descent and distribution, if such foreign state or country had jurisdiction to fix his status with respect to his adoptive parents, but this rule of international comity is subject to the condition that the law, with regard to adoption, of the state in which the real and personal property is situated, does not differ essentially from the laws of the state in which the adoption was had, so that local public policy is not violated by recognizing and giving effect to the adoption proceedings of the foreign state or country. *In re Finkenzeller,* 105 *N. J. Eq.* 44 (*Prerog.* 1929), affirmed 107 *N. J. Eq.* 180 (*E. & A.* 1930). *Cf. Ross v. Ross,* 129 *Mass.* 243 (*Sup. Jud. Ct.* 1880). It is the proviso upon which the rule is conditioned that controls the present case. We find that our public policy would be violated by recognizing and giving effect to the adoption proceedings in the

court at Corinth, and that therefore those proceedings may not prevail here.

Respondent further argues that the paragraph of the will quoted *supra* contemplates the contingency of the adoption with sufficient clearness to take the case out of the contemplation of *R. S.* 3:2–15, a point which we find it unnecessary to consider; also that Mrs. Gillies committed no fraud upon the court in Atlantic County, with which we agree; and finally that the proceedings by way of attack upon the probate and the issue of letters were barred by the lapse of time, a contention which we have preferred to pass by in order to deal with the case on its merits.

The appellant's points are: first, that the will was voided under the statute by the adoption; second, that the proceedings below were timely; third, that even if the probate be not vacated, equitable relief should be afforded by giving the infant 'a portion equal to what he would have been entitled to if the decedent had died intestate; fourth, that the Greek decree is entitled to full faith and credit. We have determined all of these questions, either directly or by necessary implication.

The judgment below will be affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices CASE, OLIPHANT, WACHENFELD, BURLING and ACKERSON—6.

*For reversal*—None.