JEROLD M. BIDWELL AND MARJORIE McKIE BIDWELL v. VIOLA McSORLEY.

September 10, 1952.

Record No. 3982.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Miller and Whittle, JJ.

The opinion states the case.

*E. Sclater Montague* and *Montague, Ferguson & Holt,* for the plaintiffs in error.

*A. L. Bivins* and *A. Jeffery Bivins,* for the defendant in error.

WHITTLE, J., delivered the opinion of the court.

Jerold M. Bidwell and Marjorie McKie Bidwell, husband and wife (defendants in the trial court) prosecute this appeal alleging that they are aggrieved by a final order of the trial court entered on October 1, 1951, revoking an interlocutory order of adoption.

The Bidwells filed a petition in the Circuit Court of Elizabeth City county on October 7, 1950, seeking the adoption and change of name of "Baby Gary", the infant son of Viola McSorley, who had executed a consent agreement for the adoption.

The usual order of reference was entered on January 12, 1951, and after an investigation the Welfare Department made its report to the court. The report was favorable and recommended the entry of the interlocutory order which was accordingly entered on April 14, 1951. The order was pursuant to section 63-352, Virginia Code, 1950,[1] and the applicable provisions of this section were included therein.

On July 12, 1951, Viola McSorley, the mother of the infant, gave notice that she would file a petition seeking to have the interlocutory order vacated. The petition filed by Miss McSorley pursuant to section 63-353, Virginia Code, 1950,[2] alleged: "that the undersigned gave consent for the adoption of this child within a few hours after she had given birth to the said child, the said child having been born at 8:42 o'clock a.m. on August 29, 1950, and the consent having been executed at about 7:00 o'clock p.m. on the same day, while the undersigned was yet under the influence of the drugs which had been administered before and after the birth, and as a result of the effectation (*sic*) of these drugs, the undersigned was unable to think clearly and, thus, when the Notary Public presented the consent, the undersigned executed the same without realizing the character of her act;" etc.

To the petition the Bidwells filed their answer. The case was

[1] § 63-352. *Entry of interlocutory order.*—If, after considering the report of the Commissioner, the court is satisfied that all of the requirements of this chapter have been complied with, that the petitioner is financially able and morally fit adequately to maintain, care for and train the child, that the child is suitable for adoption by the petitioner, and that the best interests of the child will be promoted by the adoption, it shall enter an interlocutory order of adoption declaring that henceforth, subject to the probationary period hereinafter provided for and to the provisions of the final order of adoption, the child will be, to all intents and purposes, the child of the petitioner, and, if the petition includes a prayer for a change of the child's name and the court is satisfied that such change is for the best interests of the child, that, upon entry of final order, the name of the child shall be changed. An attested copy of every interlocutory order of adoption shall be forwarded forthwith by the clerk of the court in which it was entered to the Commissioner.

[2] § 63-353. *Revocation of interlocutory order.*—The court may, by order entered of record, revoke its interlocutory order of adoption at any time prior to the entry of the final order, for good cause shown, on its own motion, or on the motion of the natural parents of the child, or of the petitioner, or of the child himself by his next friend, or of a child placing agency, or of the Commissioners; but no such order of revocation shall be entered, except on motion of the petitioner, unless the petitioner is given ten days' notice of such motion in writing and an opportunity to be heard or has removed from the State. The clerk of the court shall forward an attested copy of every such order to the Commissioner.

heard *ore tenus* and a memorandum of opinion was filed by the court. On October 1, 1951, an order was entered vacating the interlocutory order of adoption, and we granted the foster parents a writ of error and *supersedeas*.

The foster parents here contend that: (1) The action of the trial court in revoking the interlocutory order was contrary to the law and the evidence; the evidence failed to sustain Miss McSorley's contention that she agreed to the adoption while under the influence of drugs; the mere fact that the mother changed her mind as to giving up the child for adoption is not "good cause" for revoking the proceeding; and (2) The best interests of the child will be served by the consummation of the adoption proceeding.

The facts and circumstances surrounding the entry of the interlocutory order may be stated thus: Viola McSorley, a trained nurse, 29 years of age and unmarried, gave birth to a male child at a hospital in Newport News, Virginia, on August 29, 1950. Miss McSorley testified that her baby was born at 8:42 a.m.; that she signed the consent for adoption between 7:00 and 8:00 p.m. of that day; that she was upset due to the strain of not knowing what to do; that one week prior to going to the hospital she discussed with her physician, Dr. C. P. Jones, the advisability of placing the child for adoption; that she was trying to think of the baby and what would be best for it; that she recalls signing the consent for adoption, and "I realized what the paper was I had signed".

On cross-examination Miss McSorley stated that she told Dr. Jones prior to the birth that she wished to conceal the birth; that while it was a hard thing to do, it was for the welfare of the baby that it be placed for adoption; that she decided on August 23, 1950, to pursue this course; that she had made no provision for clothing the baby as she expected to leave it at the hospital; that she checked out of the hospital between 2:30 and 3:00 p.m. on August 30, 1950, leaving the baby there.

She further stated that her home was in Milwaukee, Wisconsin, that her mother lived there; that she came to Newport News by bus for the purpose of giving birth to the baby and where she could be with a Mrs. Vick, an Army nurse friend; that the father of the baby was a boy she had gone with for three years, that she thought he was not married but "don't know if he was or not";

that she was a registered nurse and had served overseas with the Army Nursing Corps.

When asked how she would provide for the baby if the court returned it to her, she stated that her mother had agreed to come from Milwaukee to attend to the baby while she worked; that she was engaged to a Naval man now stationed in Trinidad, that his tour of duty would continue for two more years and they could not marry until he returned to the States in the spring of 1953; that her prospective husband knew the circumstances regarding the baby and desired to adopt the child as he was not physically capable, due to an accident, of having children of his own.

Mrs. Dolly Hughes Vick testified for Miss McSorley and stated that she did not think Miss McSorley realized the purport of the adoption agreement when she signed it at 7:30 p.m. the day the baby was born. However, she admitted that on August 23, 1950, while in Dr. Jones' office, Miss McSorley made a definite decision to place the baby for adoption and for this reason the baby was never shown to its mother.

Dr. C. P. Jones, called as a witness for the Bidwells, testified that Miss McSorley was referred to him by Mrs. Vick; that as she was a trained nurse he made no charge for his services; that the placing of the baby for adoption was discussed with him by the mother days before its birth; that the mother had made up her mind to so place the baby and that she knew what she was signing when the consent for adoption was executed; that she discussed the signing of the consent after its execution and said she had done so for the best interests of the child.

The doctor's evidence as to Miss McSorley's condition is fully corroborated by the notary public who took the acknowledgment to the consent for adoption and also the trained nurse who was present when it was signed.

The record further shows and it is admitted by all concerned that Mr. and Mrs. Bidwell, the foster parents, are splendid people, and are in all respects capable of giving the child a suitable home.

Miss McSorley clearly knew what she was doing when she signed the consent for adoption. She had traveled from Milwaukee, Wisconsin, to Newport News, Virginia, a distance of approximately 900 miles, in order that the child's birth might be kept secret. She left her mother's home and made this long

journey to the home of her friend for this purpose. The matter of placing the child for adoption was discussed with Mrs. Vick and, most naturally, with the attending physician.

The approaching birth of a baby in lawful wedlock presents problems to expectant parents, and in the approaching birth of an illegitimate child these problems are understandably multiplied. This unmarried mother planned to meet her problem by coming to Virginia to give birth to her baby and to place it for adoption. The signing of the consent was simply carrying into effect this preconceived plan. The placing of the baby for adoption was the easiest and probably the most sensible way out of the dilemma, and she carefully, and no doubt prayerfully, chose this way.

No legal reason has been established for disturbing the interlocutory order, the vacation of which vitally affects the well-being of this child. It also disturbs important legal rights of the child's foster parents who have tenderly nurtured and cared for it since birth. The interlocutory order cannot be set aside simply because the consenting mother has changed her mind.

The interlocutory order contemplated by our statute (§ 63-352) is for the purpose of giving the Welfare Department an opportunity to visit the home of the adopting parents, to see that the child is being properly cared for, thereby forming some opinion as to the child's future should it be permitted to remain in the home.

The expression "for good cause shown" employed by the statute (§ 63-353) means that the court may take into consideration matters discovered during the pendency of the order, and if there is an unfavorable change in the situation and good cause is shown as to why the adoption should not be consummated, then the statute may be employed and the interlocutory order vacated.

But "for good cause shown" means more than the simple changing of the mind by the parent who has given consent to the adoption. "Good cause" is defined in Black's Law Dictionary (3rd Edition) as "Legally sufficient ground or reason". Where the consent has been freely and knowingly given, as in this case, and where it has, as here, been acted upon, it cannot be arbitrarily revoked.

In the case under consideration, as in all others where

the care and custody of children are involved, the paramount issue is the best interests of the child. It is admitted by counsel for Miss McSorley that the Bidwells are suitable people to have charge of the child. The trial judge observed while the hearing was in progress: "In this case I am satisfied that Mr. and Mrs. Bidwell are splendid people and the child is fortunate to be in that home."

Nowhere in the record is any attempt made to show in what respect the child will be bettered by returning it to its mother. The future of the child would be rendered uncertain. It is true that Miss McSorley says her mother will come from Wisconsin and care for the child while she works. We note also the statement regarding her contemplated marriage. We can gain nothing from either suggestion in the way of proof that the child's best interests would thus be served.

On the other hand, we now know that this baby boy is in the home of good foster parents who also have adopted a baby girl approximately four years of age, which adoption was approved by the court below. The baby boy has been in this home approximately two years as of this date and has been cared for by these good people since his birth. The adoption order has given him the name of Gary Marshal Bidwell. It has made him the child of these foster parents. Mrs. Bidwell, speaking of the child, said: "He is just like my own. We brought him into our home when he was tiny. We couldn't help but love him. I think a great deal of him and so does my husband and our other child."

If the adoption is allowed to proceed the situation of the child would appear to be secure. It is proven that he is safe in the home of good people who love him and have cared and will care for him. Certainly there is nothing in the record to the contrary. If the order appealed from, which vacates the interlocutory order, stands, he again becomes the child of the unwed mother. His legitimacy and name would be destroyed and his future, so far as the proof in the record goes, would be left in doubt and uncertainty. The best interests of the child will not permit this result.

For the reasons stated we reverse the order of the trial court and here reinstate the interlocutory order of adoption.

*Reversed.*