## Richmond

ALFRED W. NEWTON AND CATHERINE M. NEWTON v. RICHARD V. WILSON AND FLORENCE N. WILSON.

March 10, 1958.

Record No. 4759.

Present, Eggleston, Spratley, Buchanan, Miller, Whittle and Snead, JJ.

The opinion states the case.

*Philip L. Russo* (*Russo & White*, on brief), for the appellants.

*James M. Pickrell* (*Kellam & Kellam*, on brief), for the appellees.

EGGLESTON, J., delivered the opinion of the court.

On December 31, 1954, pursuant to Code, § 63-348, as amended, Richard V. Wilson and Florence N. Wilson filed their petition in

the court below alleging that they were husband and wife, residing in Norfolk county, and praying for the entry of an order allowing them to adopt James Edward Legere Newton who had been born in wedlock to Alfred W. Newton and Catherine M. Newton on July 2, 1943. The petitioners alleged that the boy had been living with them since February, 1952 (*sic*), and that his parents had consented to the adoption, as was evidenced by a paper signed by them and filed with the petition.

In response to the required order of reference (Code, § 63-349, as amended), the State Commissioner of Public Welfare filed with the lower court, under date of June 3, 1955, a report which confirmed the allegations in the petition and recommended that the adoption be allowed, subject to the probationary period. Based on this report and pursuant to Code, § 63-352, as amended, the lower court entered the usual interlocutory order of adoption, subject to the probationary period and final order thereafter to be entered.

On July 30, 1956, the natural parents filed their petition in the lower court praying for a revocation of the interlocutory order of adoption, on the ground that they had withdrawn their consent and that the adoption would not be for the boy's best interests. Subsequently, on January 28, 1957, they filed an amended petition, again praying for the revocation of the interlocutory order and alleging that there had been further developments, not referred to in their former petition, which showed that the proposed adoption was not for the best interests of the boy.

On the same day the lower court entered an order dismissing the petition and amended petition. It then entered a final order consummating the adoption, and from that order Alfred W. Newton and Catherine M. Newton, the boy's natural parents, have appealed.

The final order of adoption recites that the court deems "it unnecessary to take further evidence" beyond the reports of the Commissioner of Public Welfare and those of "out of state welfare agencies" filed therewith. It adjudged that upon consideration of such reports and the fact that the Commissioner "raises no objection to the adoption," the petition of the natural parents to withdraw their consent should be denied and the final order of adoption granted.

The principal assignment of error and the only one we need consider is that the lower court erred in entering the final order of adoption without hearing additional evidence on the issues raised in the petition and amended petition of the boy's natural parents.

The facts as disclosed by the various investigatory reports may be stated thus:

James Edward Legere Newton, the subject of this controversy, was born on July 2, 1943, the son of Alfred W. Newton and Catherine M. Newton, his wife. At the time of his birth his parents had separated but thereafter became reconciled. Florence N. Wilson is an elder sister of the boy whom she and her husband, Richard V. Wilson, desire to adopt.

At the time the petition for adoption was filed, on December 31, 1954, Richard V. Wilson was a chief petty officer in the United States Navy, stationed in the Norfolk area, and residing with his wife in Norfolk county. Florence N. Wilson had been previously married and divorced three times, but at the time of these proceedings was happily married to her present husband. They have no children. The boy, whose natural parents were then living in California, had been making his home with his sister and her husband since April, 1953.

Shortly before the entry of the interlocutory order of adoption in June, 1955, Wilson was transferred to the Great Lakes Naval Training Station near Chicago. Mrs. Wilson and the boy joined her husband at his new location where she obtained employment at a substantial salary.

While the Wilsons were at the Great Lakes Station the Commissioner, pursuant to Code, § 63-354, as amended, requested representatives of the Department of Public Welfare of the State of Illinois to make periodical visits to the Wilson home and report on the situation. These representatives made reports of their visits to and interviews with the prospective adoptive parents and the boy. They gave favorable reports of the stability in and environment of the Wilson home. They further reported that the boy was happy with his adoptive parents and was making satisfactory progress at a Catholic parochial school which he was then attending. In one report it was said that the boy's mother, Mrs. Newton, had been interviewed and that she, her husband, and the boy were agreeable to the adoption.

The representatives of the Illinois department further reported that in November, 1955, the Wilsons brought into their home Herbert Wilson, aged fourteen, a nephew of Richard V. Wilson. Although Herbert had been brought from a correctional school, he became happily adjusted in the Wilson home and was a suitable com-

panion for James. He was later adopted by the Wilsons under the laws of the State of Illinois.

In May, 1956, Wilson was transferred to Pearl Harbor where his wife joined him a month or so later. The two boys, James and Herbert, were to go to Pearl Harbor in the early fall and in the meantime went to the Newton home which was then in California.

On June 19, 1956, counsel for Mrs. Newton notified the Commissioner that she had withdrawn her consent to the adoption of her son, James, by the Wilsons, because, she said, she had learned that the proposed adoptive parents were "not morally suitable or proper persons to care for and train the child," that his "best interests" would not be promoted by the adoption, and that the boy did not desire that it be consummated. About the same time Mrs. Newton notified the Wilsons of her withdrawal of consent to the adoption. The Wilsons were naturally upset with this development and were unwilling to abandon the adoption proceeding.

At the request of the Commissioner, representatives of the welfare department of Lake county, California, sought an interview with the Newtons. Because of his working hours they were unable to interview Newton, but talked with Mrs. Newton, the boy's mother. She expressed her deep devotion for her son and her desire that he be allowed to remain with her and her husband. She stated that when she and her husband consented to the adoption they had not fully realized the implications of the proceedings and the fact that they would "completely lose their boy." Moreover, she said, her son, James, was dissatisfied with Mrs. Wilson's discipline and her attitude toward his serious consideration "of going into the priesthood," and that he desired to remain with his natural parents.

According to this report, Mrs. Newton gave no indication that she considered that Mrs. Wilson and her husband were not suitable or fit persons to have custody of the boy.

Under date of August 14, 1956, the Commissioner made a full report to the lower court of these developments since the entry of the interlocutory order. He did not recommend either that the interlocutory order be revoked or that the adoption be consummated. He concluded the report with these pertinent observations:

"To the Commissioner's knowledge, neither the adoptive father, the natural father, nor James, the child to be adopted, have been seen since Mrs. Newton's request for withdrawal of consent. There is no indication except through the natural mother, Mrs. Newton, that the

original plans for adoption of James by the Wilsons is not a satisfactory plan for all, and it is noted that when Mrs. Newton was seen in September, 1955, while visiting the Wilsons in Illinois, she felt the adoption was a good plan. The adoptive mother has raised question regarding the marital status of the natural mother and Mr. Newton.

"It is believed that the court will want complete information regarding the circumstances and developments as reported to the Commissioner subsequent to his being informed of the natural mother's desire to withdraw her consent to the adoption. The Commissioner has retained copies of correspondence received and the original letters are attached to this report.

"The court may wish more information regarding the situation, particularly since the petitioners are at a distance, the child is not with them and has not expressed his feelings in the matter to an agent of the Commissioner. If it is the wish of the court, continued effort will be made to secure such information."

In the meantime, on July 30, 1956, the natural parents had filed their petition praying for a revocation of the interlocutory order of adoption. This was followed by the filing of an amended petition on January 28, 1957, and the entry of the final order of adoption on the latter date.

The refusal of the lower court to hear additional evidence on the issues raised by the petition and amended petition of the boy's natural parents was error. In adoption proceedings the prime consideration is the best interests of the child. *Morris* v. *Children's Home Society*, 188 Va. 127, 134, 49 S. E. 2d 294, 297; *Bidwell* v. *McSorley*, 194 Va. 135, 140, 141, 72 S. E. 2d 245, 249.

Code, § 63-353, as amended, provides that the court may revoke its interlocutory order of adoption at any time prior to the entry of the final order "for good cause shown." The purpose of this statute and the interlocutory order is to provide an opportunity for inquiring into and the consideration of matters which may have developed during the pendency of the order and which may constitute "good cause" for its revocation and the dismissal of the adoption proceeding. *Harmon* v. *D'Adamo*, 195 Va. 125, 129, 77 S. E. 2d 318, 320.

In *Bidwell* v. *McSorley, supra,* we pointed out that "good cause shown" means something more than a mere change of the mind by the parent who has consented to the adoption. 194 Va., at page 140, 72 S. E. 2d, at page 249.

The wording of the final order of adoption in the present case indicates that the lower court considered the withdrawal of the consent of the natural parents as the only cause alleged for the revocation of the interlocutory order. But that is not so. In their petition and amended petition the natural parents allege more than the mere withdrawal of their consent. They allege that since the entry of the interlocutory order there have been developments which, if true, show that the adoption should not be consummated. It is alleged that the boy does not now consent to the adoption, that on several occasions the proposed adoptive mother, his sister, has "threatened to do bodily harm" to him, and that he is rebellious at the prospect of leaving his parents and returning to the Wilson home. Moreover, unfortunate as it may be, the natural parents further allege that their daughter, Mrs. Wilson, is not a suitable person to have the care and custody of this boy. Further, they allege that because of the recent misconduct of Herbert, the other adopted son, association with him in the Wilson home is "definitely a bad influence on James."

It is significant that the last report of the Commissioner does not recommend that the adoption be consummated. It points out that the boy and his father have not been recently interviewed and their wishes ascertained with respect to the adoption. It suggests that these matters and circumstances should be fully inquired into before the entry of a final order in the cause.

The boy, who was born on July 2, 1943, will shortly be fifteen years old. Code, § 63-351, as amended, provides that consent by the child to the adoption "shall be necessary if the child is fourteen years of age or older." It is true that at the date of the entry of the final order, on January 28, 1957, the boy had not reached that age, but he was so near that age that his wishes and desires with respect to the adoption should have been ascertained and considered. If it be true, as alleged, that he is now opposed to the consummation of the adoption, it is difficult to understand why the prospective adoptive parents, one of whom is his own sister, would want to pursue that course.

These matters which have developed since the entry of the interlocutory order, are of grave importance to the welfare and best interests of this boy and to the peace and happiness of all concerned. The entry of a final order should have been deferred until they had been inquired into, with the full opportunity to both sides of presenting evidence on whether the adoption should be consummated or the interlocutory order revoked and the proceeding dismissed. *Morris*

v. *Children's Home Society*, *supra*, 188 Va., at page 134, 49 S. E. 2d, at page 297.

In order that this course may now be followed, the order appealed from is reversed and the cause remanded.

*Reversed and remanded.*