## Staunton

DIALEHTI KARAVELIA DOULGERIS v. JOSEPH S. BAMBACUS, ADMINIS-
TRATOR OF THE ESTATE OF JAMES ODESSETT, DECEASED, ET AL.

August 31, 1962.

Record No. 5428.

Present, Eggleston, C. J., and Spratley, Buchanan, Snead, I'Anson and Carrico, JJ.

*Roland C. Woodward* (*Wesley H. Caldwell; McGuire, Eggleston,
Bocock & Woods,* on brief), for the appellant.

*John W. Edmonds, III (Richmond Moore, Jr.; Tucker, Mays, Moore & Reed,* on brief), for the appellees.

EGGLESTON, C. J., delivered the opinion of the court.

Joseph S. Bambacus, as administrator of the estate of James Odessett, deceased, filed his bill in the court below praying that it determine the heirs at law, next of kin and distributees of the estate of the decedent, a native of Greece, a naturalized citizen of the United States, and a resident of the city of Richmond at the time of his death.

The cause was referred to a commissioner in chancery with direction to report who are the heirs at law and next of kin of the decedent and what persons are entitled to his estate. The commissioner heard the evidence on behalf of a number of claimants, including Dialehti Karavelia Doulgeris, hereinafter referred to as "Doulgeris." She had filed an answer to the bill alleging that she was entitled to the net estate because, she said, she was the sister by adoption of the decedent, having been adopted under the laws of the Kingdom of Greece as the daughter of decedent's father, and that the decedent had not been survived by any nearer relative.

The commissioner filed a report rejecting the claim of Doulgeris and from a decree overruling her exceptions thereto she has appealed.

The underlying facts are not in dispute. James Odessett, the decedent, died intestate, unmarried, and without issue in the city of Richmond on February 5, 1954, at the age of sixty-nine years, leaving considerable personal estate. He was a native of Greece but had been naturalized under the laws of the United States in 1926. At the time of his death his father and mother were dead and all of his blood brothers and sisters had died without issue.

While the records of the Greek Registry had been destroyed in 1945 by fire resulting from war hostilities in the area, there was evidence on behalf of Doulgeris that she had been adopted by Odessett's father in a court proceeding at Chalkidiki, Greece, in February or March, 1940. At that time she was forteen years of age and her father consented to the adoption. The adoptive father was eighty-six years of age; the adoptive mother was sixty-eight years old and a bedridden paralytic. According to the statement of the adoptive father, because of his age and his wife's condition, "we have the need of a child for our attendance, consolation and support." The adoptive mother was not present at the adoption proceedings nor

was her consent thereto required under the laws of Greece. The child's natural father was present and consented. Her natural mother did not consent.

Doulgeris did not testify in the present case and the record is silent as to whether she ever lived with her adoptive parents. The adoptive mother died in May, 1940, and the adoptive father in September, 1941. The marriage license of Doulgeris, dated 1951, makes no mention of her adoptive parents but gives her natural parents.

According to the opinion of Dr. C. N. Goulimis, an advocate entitled to practice before the Supreme Court of Greece, this proceeding met the requirements of an *adoptio minus plena*, that is, the adoption of a person by one other than an ascendant relative. In that type of adoption no investigation into the propriety of the adoption is required.

Based on this evidence the commissioner and the lower court found that Doulgeris had been adopted by Odessett's father according to the laws of the Kingdom of Greece. While the brief of the appellees questions the correctness of this finding, no cross-assignment of error was filed to it and hence we are not concerned on this appeal with the validity of the adoption. See Rule 5:1, § 4.

However, the commissioner held that the policy of the adoption laws of the Kingdom of Greece "is essentially different and contrary, in practice and concept, to [*sic*] the public policy of Virginia," in that under the adoption laws of Greece the primary consideration is the best interests of the adoptive father, while under the adoption laws of Virginia the primary consideration is the welfare and best interests of the child, and that because of such difference "in concept and purpose" Doulgeris is not entitled to the status of an adopted sister of the decedent and the right under our adoption laws and the laws of descent and distribution to share in his estate as such. In confirming the report the lower court adopted the same view.

In her appeal Doulgeris makes two contentions: (1) The finding of the commissioner and the lower court that the policy of the adoption laws of the Kingdom of Greece is contrary to the public policy of Virginia is contrary to the law and the evidence; and (2) such finding fails to recognize and give effect to the treaty now in effect between the United States and the Kingdom of Greece.

The appellees concede that under the broad language of Code, §§ 63-357 and 63-358, as amended, and the provisions of §§ 64-1, as amended, and 64-11, Doulgeris would be entitled to share in the distribution of the estate of her adopted brother, Odessett, unless the

public policy of this State forbids the recognition of her adoption. In view of that concession and the ultimate conclusion we have reached, it is not necessary that we inquire into that matter.

According to the great weight of authority, "for purposes of determining the descent and distribution of the property of an intestate decedent and the right of an adopted child to share in such estate, a status of adoption acquired under the law of one state will be recognized and given effect in another state where, in the case of real property, the decedent's property is located or, in the case of personal property, where the decedent was domiciled, provided that the foreign court had jurisdiction of the adoption proceedings and also to fix the status of the child with respect to the adoptive parents, and that the recognition of that status as fixed by the foreign decree is not inconsistent with, and will not offend, the laws of the public policy of the forum." 2 Am. Jur. 2d, Adoption, § 114, p. 956. See also, *Cook v. Todd's Estate,* 249 Iowa 1274, 90 N. W. 2d 23, 25, 66 A. L. R. 2d 1257; *Phelan v. Conron,* 323 Mass. 247, 81 N. E. 2d 525, 527; *Zanzonico v. Neeld,* 17 N. J. 490, 111 A. 2d 772, 775; *Guarantee Bank & Trust Co. v. Gillies,* 8 N. J. 88, 83 A. 2d 889, 895. Compare, *Brown v. Finley,* 157 Ala. 424, 47 So. 577, 21 L. R. A., N.S., 679, 131 Am. St. Rep. 68, 16 Ann. Cas. 778.

The same principle applies to the recognition of adoption proceedings of a foreign country. *Zanzonico v. Neeld, supra; Guarantee Bank & Trust Co. v. Gillies, supra.*

The recognition of such foreign adoption decrees is based upon comity, and not upon the full faith and credit clause of the Federal Constitution. 2 Am. Jur. 2d, Adoption, § 116, p. 959; *Hood v. McGehee,* 237 U. S. 611, 59 L. ed. 1144, 35 S. Ct. 718; *Zanzonico v. Neeld, supra,* 111 A. 2d, at page 774.

It is equally well settled that foreign law or rights based thereon will not be given effect or enforced if contrary to the settled public policy of the forum. 15 C. J. S., Conflict of Laws, § 4-c(4), p. 853; 11 Am. Jur., Conflict of Laws, § 6, pp. 300, 301. See also, *Toler v. Oakwood Smokeless Coal Corp.,* 173 Va. 425, 434, 4 S. E. 2d 364, 368, 127 A. L. R. 430; *Isaac Fass, Inc. v. Pink,* 178 Va. 357, 363, 17 S. E. 2d 379, 381; *Poling v. Poling,* 116 W. Va. 187, 179 S. E. 604, 606.

In *Guarantee Bank & Trust Co. v. Gillies, supra,* the New Jersey court, in a proceeding to settle the estate of a resident of that State, refused to recognize as an adopted son of the decedent a minor nephew who claimed that he had been adopted by the decedent and

his wife under the laws of the Kingdom of Greece, but who had never seen or resided with his adoptive parents either before or after the decree of adoption. It was there held that the recognition of such an adoption would offend the public policy of the State of New Jersey.

On the other hand, in *Zanzonico* v. *Neeld, supra,* the same court recognized a decree of adoption under the laws of Italy where a small child residing in that country was adopted by her uncle and aunt, residents of New Jersey, and brought to the latter State and lived with her adoptive parents for two and one-half years before the death of the adoptive father. The court there pointed out that while the adoption proceedings in Italy were different from those in New Jersey, such difference did not offend the public policy of the latter State.

In Virginia, as in other jurisdictions in this country, in adoption proceedings the primary consideration is the welfare and best interests of the child. *Newton* v. *Wilson,* 199 Va. 864, 868, 102 S. E. 2d 299, 302; *Bidwell* v. *McSorley,* 194 Va. 135, 140, 141, 72 S. E. 2d 245, 249; 2 Am. Jur. 2d, Adoption, § 61, p. 910; 2 C. J. S., Adoption of Children, § 39-b, p. 425.

Accordingly, the adoption statutes in this State are designed to that end. In the case of married persons the petition for adoption must be the joint petition of the husband and wife. (Code, § 63-348, as amended.) Both natural parents, if living, must consent to the adoption unless such consent be dispensed with for cause. The child, too, at fourteen years of age or older, must consent thereto in writing. Code, § 63-351, as amended.

Upon the filing of the petition the court directs that an investigation be made as to whether the petitioner is financially able and morally fit to care for and train the child; what the physical and mental condition of the child is and whether it is suitable for adoption by petitioner; why the natural parents, if living, desire to be relieved of the responsibility of the care, custody and maintenance of the child; what their attitude is toward the proposed adoption, and the circumstances under which the child came to live, and is living, in the home of the petitioner. The court usually enters an interlocutory order of adoption for a probationary period of one year, during which the child is visited in the new home at least once every three months. (Code, §§ 63-352, 63-354, as amended.[1]) "For good cause shown,"

---

[1] The probationary period and interlocutory order may be omitted under special circumstances. Code, § 63-355, as amended.

and where the best interests of the child so require, the court may revoke the interlocutory order of adoption and dismiss the adoption proceedings. Code, § 63-353, as amended.

Comparing the Greek adoption proceedings, we note that the adoptive mother was not present at the proceedings and did not consent thereto, nor are such presence and consent required. The child's natural father was present and consented. The presence and consent of the natural mother are not required. No investigation was made as to whether the adoption was for the welfare and best interests of the child. Indeed, according to the opinion of Dr. Goulimis, in this type of adoption no such investigation is required under the laws of Greece.

Moreover, there is no evidence that the adoption was ever consummated, that the child severed her relation with her natural parents, went to live with her adoptive parents and became a member of the latter family. As has been said, the record shows that the purpose of the adoption was for the convenience of the adoptive parents, and that because of the adoptive mother's physical condition the child was needed for the couple's attendance, consolation and support. In short, this was merely an arrangement for the convenience of the adoptive parents, consented to by the natural father, and without regard as to how it affected the welfare and interests of the child.

We agree with the commissioner and the lower court that this type of adoption through which Doulgeris claims is so different from the adoption contemplated by our statutes that it would be contrary to the public policy of this State to hold that she is a "legally adopted child" who is entitled to inherit under Code, § 63-358, as amended. As we said in *Clarkson* v. *Bliley*, 185 Va. 82, 90, 38 S. E. 2d 22, 26, 171 A. L. R. 1308, "the right to inherit as an adopted child cannot in Virginia be created by a private contract."

█ There is no substance to the appellant's claim that the refusal of the lower court to give her the status of an adopted child within the meaning of our statutes violates the rights guaranteed to her under the existing treaty between the United States of America and the Kingdom of Greece.[2] That treaty guarantees among other things that, "Each Party shall at all times accord equitable treatment to the persons, property, * * * and other interests of nationals * * * of the other Party," that is, "treatment * * * upon terms no less favorable than the treatment accorded therein, in like situations, to nationals

[2] Knauth's Benedict on Admiralty, 7th Ed., Vol. 6, p. 51; 1955 American Maritime Cases, p. 1396,

\* \* \* of any third country." In short, the contention is that the decree of the lower court denies the appellant the right to inherit the property of her adopted brother under the laws of Virginia, a right which, she says, is guaranteed to her as a "national" of Greece under the terms of the treaty.

The answer to this contention is that the decree does not deny the right of inheritance to the appellant under the laws of Virginia. What it denies to her is the right to inherit by virtue of her status as an alleged adoptive relative of the decedent—a status which we hold has been fixed in a proceeding the purpose and object of which are contrary to the public policy of this State. In refusing to recognize a status thus fixed, the courts of Virginia treat alike the proceedings of all other States and foreign countries. We refuse to recognize the proceedings of any State or foreign country which offend our public policy.

What the appellant asks here is that we afford to her better treatment than we afford to the citizens of other States or nations, that we recognize her status as an adoptive relative of the decedent although it had been fixed in a proceeding whose purpose and object are repugnant to our laws. The treaty upon which she relies guarantees to the nationals of Greece no such preferred right.

In our opinion, the decree of the lower court is right and accordingly it is

*Affirmed.*