LAILA M. STELLMAH, PETITIONER-APPELLANT, v. HUN-
TERDON COOPERATIVE G.L.F. SERVICE, INC., RESPON-
DENT-RESPONDENT.

Argued January 10, 1966—Decided May 9, 1966.

164

*Mr. Herbert T. Heisel, Jr.,* argued the cause for appellant (*Mr. Thomas J. Beetel* on the brief).

*Mr. Scott Scammell,* II argued the cause for respondent (*Messrs. Large, Scammell & Danziger,* attorneys).

The opinion of the court was delivered by

SCHETTINO, J. This is an appeal from a judgment of the Appellate Division, 88 *N. J. Super.* 131 (*App. Div.* 1965), which had reversed the Hunterdon County Court's affirmance of a judgment of the Workmen's Compensation Division awarding death benefits under *N. J. S. A.* 34:15–13 to a child who was allegedly adopted in the Province of Quebec, Canada. We granted certification on plaintiff's application, 45 *N. J.* 587 (1965).

Because of the unusual nature of the case we set forth the facts at length. On June 26, 1961 Frank M. Stellmah, Sr. suffered an accident which admittedly arose out of and in the course of his employment with respondent, Hunterdon Co-operative G. L. F. Service, Inc. He died that same day leaving surviving him the petitioner, Laila M. Stellmah, his wife, and a seven-year-old daughter, Susan. His widow claimed death benefits under *N. J. S. A.* 34:15–13 for herself, her daughter and her "adopted" son, Frank M. Stellmah, Jr. At the time of his death Frank M. Stellmah, Sr. was earning $105 per week.

Respondent paid the required medical, hospital and funeral expenses and also paid to the widow and her daughter "40% of wages" as required by *N. J. S. A.* 34:15–13(b). But respondent refused to pay such benefits to Frank M. Stellmah, Jr. on the grounds that he was not "legally adopted" within the meaning of *N. J. S. A.* 34:15–13(g) which defines "dependents", to whom death benefits must be distributed as including:

"* * * any or all of the following who are dependent upon the deceased at the time of accident or the occurrence of occupational dis-

ease, or at the time of death, namely: Husband, wife, parents, step-parents, grandparents, children, stepchildren, grandchildren, child in esse, posthumous child, illegitimate children, brothers, sisters, half brothers, half sisters, niece, nephew. Legally adopted children shall, in every particular, be considered as natural children."

Thereafter, petitioner brought a Workmen's Compensation Court action claiming death benefits for Frank, Jr. as the "legally adopted" son of Frank M. Stellmah, Sr.

It is stipulated that Frank, Jr. is not related by blood or marriage to either decedent or his widow. He was born in Montreal, Canada, on September 25, 1958. He was placed for adoption with La Societe D'Adoption et de Protection de L'Enfance in Montreal in the Province of Quebec, Canada.

In July, 1958, the Stellmahs applied to adopt a child through the Catholic Welfare Bureau, Trenton, an agency approved under *N. J. S. A.* 9:2–13(a) for the placement of children with adopting parents. In February 1960 they were notified by the Societe through the Trenton Bureau that a male child was available for adoption in Montreal. On February 24, 1960 the Stellmahs went to Montreal where they obtained custody of Frank, Jr. by executing an affidavit of support and a written agreement with the Societe, as Party of the First Part, dated February 29, which stated:

"1° THE PARTY OF THE SECOND PART [Stellmah] hereby agrees to take custody of a child born on the 25th day of September 1958 * * *.

2° THE PARTY OF THE SECOND PART recognizes that the custody of the said child is in view of a future Legal Adoption."

The child was brought to New Jersey, immigrating by virtue of a visa as a "non-quota immigrant", 8 *U. S. C.* § 1101 (a) (27) (C) (1952) as amended (*Supp.* IV, 1957).

The adoption should have become final on or about March 1, 1961 under the Quebec Adoption Law, *R. S. Q.* 1941, c. 324, § 13, which provides that after a probationary period of one year after a custody agreement is signed, the adoptive

parents should apply to the Social Welfare Court for a judgment of adoption.

However, the child developed a speech defect and approval of the adoption was postponed by the Trenton Catholic Welfare Bureau so that the Stellmahs could have Frank, Jr. examined to determine whether the defect was organic, *i.e.,* a nerve system or brain disorder, or merely psychological. The examination was accomplished at the Hunterdon Medical Center by Dr. Avrum Labe Katcher, Director of Pediatric Services, who reported on June 19, 1961 that there was no evidence of any gross central nervous system abnormality or defect. Doctor Katcher advised the immediate completion of the adoption procedure. Thus, on June 19, 1961 the Stellmahs were in an immediate position to complete the adoption procedure. One week later Frank, Sr. died from his work-connected injuries.

The adoption proceedings were nevertheless continued and on August 3, 1961—some five weeks after decedent's death— a hearing was had in the Social Welfare Court which rendered a judgment of adoption on September 11, 1961. Although no records are maintained as to what transpired at the hearing,[1] the judgment contains the following statement:

"Judgment has been rendered on the eleventh day of September 1961 ordering the adoption by FRANK MICHAEL STELLMAH, Skilled Worker and LAILA MARION SMULL, his wife, * * * of FRANK MICHAEL STELLMAH, Jr. * * *."

A new birth certificate was issued by the Presbytere de Saint-Jacques (repository of the register of Civil Status for the child) on September 20, 1961.

Respondent does not question the legality of this adoption but contends that, as the effective date of the adoption was some eight weeks after the decedent's death, it is not liable

---

[1] Under Quebec Law, *R. S. Q.* 1941, c. 324, §§ 7, 29, adoption proceedings are held in camera, all records are kept confidential and no appeal allowed from the Court's judgment.

for death benefits as the child was not "legally adopted" by Mr. Stellmah within *N. J. S. A.* 34:15–13(g). The Workmen's Compensation Division agreed with this contention but held that the child came within the enumerated dependents in the statute under the theory of *in loco parentis* and granted an award for the widow and both dependent children, Susan and Frank, Jr. The decision was upheld by the Hunterdon County Court.

The Appellate Division reversed, finding that, although Frank, Jr. could be said to be a dependent in the sense that he depended upon the Stellmahs as would a child born of the marriage, the Legislature clearly indicated by the use of the term "legally adopted" that mere dependency is insufficient a ground for obtaining death benefits unless the formal statutory requisites of adoption were completed prior to the adopting father's death.

Thus, the problem involved in this action is the interpretation of the term "legally adopted" in *N. J. S. A.* 34:15–13(g).

I.

█ As in all construction problems concerning the Workmen's Compensation Act, it is axiomatic that we give a liberal interpretation to the provisions of the statute in order to insure the accomplishment of the statutory remedial goals. *N. J. S. A.* 34:15–42; *Close v. Kordulak Bros.,* 44 *N. J.* 589, 604 (1965).

█ █ To overcome the harsh common law rules which often resulted in a denial of recovery to injured workmen or their dependents where death or injuries occurred from the work-connected accidents, the Legislature enacted a comprehensive Compensation Act, *N. J. S. A.* 34:15–1 *et seq.,* providing for (a) a system of liability without fault, which was intended to overcome tort distinctions, (b) a guaranteed payment by employers or their insurance carriers of the compensation, thus making the cost of work-connected injuries a

part of the cost of the employers' product to be borne by the consuming public, and (c) a system whereby society is relieved as a whole of the burden of supporting those who are injured or die from injuries suffered in the course of their employment and the dependents of those whose death was caused by work-connected injuries. *Maver v. Dwelling Managers Co.*, 34 *N. J.* 440, 443 (1961); *Renshaw v. United States Pipe & Foundry Co.*, 30 *N. J.* 458, 465 (1959); *Tocci v. Tessler & Weiss, Inc.*, 28 *N. J.* 582, 586 (1959); *Morris v. Hermann Forwarding Co.*, 18 *N. J.* 195, 197–198 (1955). See I Larson, *Workmen's Compensation*, § 1 *et seq., pp.* 1–21 (1952); I Schneider, *Workmen's Compensation*, § 1 *et seq., pp.* 1–26 (1941). *N. J. S. A.* 34:15–13 provides a formula of compensation based upon the workman's wages at the time of his death to be paid to his dependents as death benefits. *Ricciardi v. Damar Products Co.*, 45 *N. J.* 54 (1965). The dependents to whom these death benefits are required to be paid are to be determined by a finding that the person claiming the benefits is not only an actual dependent of the deceased worker but also bears to the worker one of the specified statutory enumerated relationships. *Fedi v. Ryan*, 118 *N. J. L.* 516, 519 (*Sup. Ct.* 1937). See generally, 9 *Schneider, Workmen's Compensation*, § 1901, *p.* 5 (1950).

In *Fedi*, it was contended that a niece by marriage was a dependent under the act. It was there stipulated that the infant was and for a period of five years had been a member of the deceased workman's family and was "actually dependent upon him." The court held that the infant could not make a claim as a dependent, for actual dependency alone was insufficient if the child did not fall within the enumerated classes of dependents. The court rejected the further claim that a liberal construction of the statute required that a niece by marriage be considered a "niece" within the meaning of the act, finding that the Legislature intended consanguineal nieces and not nieces by affinity to be dependents. See, *Pierson v. National Fire Proofing Corp.*, 117 *N. J. L.* 600 (*Sup. Ct.* 1937); *Ayers v. Public Service Co-ordinated*

*Transport,* 16 *N. J. Misc.* 60, 196 *A.* 466 (Work. Comp. Bur. 1938).

■ We agree with the Appellate Division that Frank, Jr. cannot recover death benefits under a theory of *in loco parentis,* as that rule is no more than a description of "actual dependency." *Amadeo v. Amadeo,* 64 *N. J. Super.* 417, 425 (*App. Div.* 1960); *D. v. D.,* 56 *N. J. Super.* 357, 361 (*App. Div.* 1959); *Mott v. Iossa,* 119 *N. J. Eq.* 185, 187 (*Ch* 1935); *Brinkerhoff and Wife v. Merselis' Executors,* 24 *N. J. L.* 680 (*Sup. Ct.* 1855).

## II.

■■ Petitioner contends that Frank, Jr. can be compared to a *child in esse* as of the date of Frank, Sr's. death and as a child born posthumously is entitled to recover compensation as a dependent, *Close v. Kordulak Bros., supra; Bower v. Metal Compounds Corp.,* 121 *N. J. L.* 421 (*Sup. Ct.* 1938), affirmed o. b. 122 *N. J. L.* 380 (*E. & A.* 1939), so should this child whose formal judgment of adoption was completed after his adoptive father's death but initiated prior thereto. This argument must be rejected not only because it misconstrues the meaning of the terms "child" and "legally adopted" in *N. J. S. A.* 34:15–13(g) but also because such an interpretation would be an arbitrary judicial expansion of the scope of the statute beyond the plainly expressed legislative intent. *Eckert v. New Jersey State Highway Department,* 1 *N. J.* 474 (1949); *Singer Sewing, Inc. Co. v. New Jersey Unemployment, Etc.,* 128 *N. J. L.* 611 (*Sup. Ct.* 1942); *Fedi v. Ryan, supra.*

Adoption was unknown to the common law, although it was commonly practiced and regulated under the Civil Law of both ancient Greece and Rome. *In re Coe's Estate,* 42 *N. J.* 485 (1964); *In re Holibaugh's Will,* 18 *N. J.* 229 (1955); *In re Flasch's Guardianship,* 51 *N. J. Super.* 1 (*App. Div.* 1958). The first total regulation of the process was found in the Justinian Code from which our modern legislation de-

rives its principles. Under this code, once the prescribed formalities were met, the adopted person was entitled to inherit from the adoptive father, both testate and intestate, and there was created the relation of paternity and filiation not before legally recognized. See *Comparative Analysis of Adoption Laws* (1956), *United Nations, Department of Economic and Social Welfare, pp.* 1–5.

Our Adoption Act, *N. J. S. A.* 9:3–17 *et seq.,* seeks to accomplish these same goals of succession, paternity and filiation by prescribing certain procedures to be met before the relationship of parent and child can be established. *In re Holibaugh's Will, supra;* Silberman, "Adoption In New Jersey—An Analysis of its Legal Effects and Consequences," 1 *Rutgers L. Rev.* 250 (1947); 7 *N. J. Practice (Clapp, Adoptions),* § 1801, *p.* 256 (1962); 19 *N. J. Practice (Epstein, Adoptions),* §§ 711–727, *pp.* 409–441 (1960); Note, "Survey of the Law of Adoption," 16 *Rutgers L. Rev.* 379 (1962).

The status created under adoption statutes is recognized by the Legislature in *N. J. S. A.* 9:3–30 as granting the adopted child certain legal rights and privileges under the testate and intestate laws, *N. J. S. A.* 3A:3–1 *et seq., N. J. S. A.* 3A:4–1 *et seq.,* as well as the Workmen's Compensation Act, *N. J. S. A.* 34:15–13(g). In this latter provision the term "legally adopted" is used rather than the simple term "adopted." While the use of the term "legally" to prefix the term "adopted" or "adoption" is common, it is really tautological. The full meaning of the concept is conveyed by the term "adopted" alone, for the mere taking of a child into a family and treating it as a natural offspring, without complying with the formal procedures as prescribed by law, is not adoption.

However, it cannot be said that the use of the term "legally" in *N. J. S. A.* 34:15–13(g) has no purpose or is a nullity. See *State by Richman v. Sperry & Hutchinson Co.,* 23 *N. J.* 38, 46 (1956); 2 *Sutherland, Statutory Construction* (*3d ed.*) § 4705, *p.* 339. Although the term has not been interpreted in our jurisdiction, it is generally held that the Leg-

islature intended by use of the term "legally" prefixing "adopted" in a dependency provision of a Workmen's Compensation Act to exclude all grafting of persons into and upon the family stock of a workman, whose death was due to a work-connected injury and thus eligible for death benefits, otherwise than by some adoption proceedings conforming to the law purported to govern the subject person. See, 2 *Larson, Workmen's Compensation,* §§ 62–64, *pp.* 89–134; 9 *Schneider, Workmen's Compensation,* § 1914(c), *pp.* 59–60.

 It does not follow, however, that for one to be "legally adopted" within *N. J. S. A.* 34:15–13(g), he must be adopted in accordance with the provisions of *N. J. S. A.* 9:3–17 *et seq.* Ordinarily, the status and the relationship of a person to another person is fixed by the law of the state or country having jurisdiction to grant the status which is claimed. *Zanzonico v. Neeld,* 17 *N. J.* 490 (1955); Goodrich, *Conflicts of Law* (1964) §§ 146, 147; *Restatement (Second), Conflicts of Laws* § 119 (*Tent. Draft No.* 4, 1957).

 In *Zanzonico,* the child had been adopted under a decree entered by the Court of Appeal of Potenza, Italy. The Transfer Inheritance Tax Bureau contended that because Italian law did not require a one-year residency period before a judgment of adoption could be entered as required by the New Jersey statute, the policy of our adoption laws required a finding that this child was not entitled to share in the adoptive father's estate. Mr. Justice Wachenfeld, for a unanimous court, rejected this contention (17 *N. J.,* at *p.* 497) :

"To accept the bureau's interpretation of the public policy of our adoption laws would, in practical effect, prevent children adopted under the laws of other jurisdictions which do not require the one-year prior residency from inheriting property in this state. *Such a result would be incompatible with what we think the Legislature had in mind with respect to the welfare of adopted children.*" (Emphasis added.)

The court concluded that *L.* 1952, *c.* 234, providing that judgments and decrees of adoption granted by our sister

states should be given the same purpose and effect as though such judgments and decrees had been rendered and entered in this State, evidenced a persuasive inference that our public policy does not preclude the courts of this State from recognizing foreign adoption decrees entered under laws different from our own simply because the law of the place of adoption imposes less stringent requirements. See *Corbett v. Stergios, Iowa,* 137 *N. W. 2d* 266 (*Sup. Ct.* 1965); *Doulgeris v. Bambacus,* 203 *Va.* 670, 127 *S. E. 2d* 145 (*Sup. Ct. App.* 1962); *In re Topcuoglu's Will,* 11 *Misc. 2d* 859, 174 *N. Y. S. 2d* 260 (*Surr. Ct.* 1958). Tainter, "Adoption in the Conflicts of Laws," 15 *U. Pitt. L. Rev.* 222 (1954); *Restatement (Second), Conflict of Laws,* § 143 (*Tent. Draft No.* 4, (1957). We think that the public policy of this State in respect to the welfare of adopted children is equally applicable to the dependency provisions of the Workmen's Compensation Act and requires dependency benefits to be paid to a child adopted under foreign law.

### III.

As the adoption here was entered by the Social Welfare Court of Montreal, Quebec, pursuant to Quebec law, it is necessary to determine whether Frank, Jr. was the adopted son of the decedent at the time of his death under Quebec law and thereby entitled to death benefits under *N. J. S. A.* 34:15–13.

To aid in the interpretation of Quebec Law, petitioner in accordance with *N. J. S. A.* 2A:82–31 submitted a certified translation of "An Act Respecting Adoptions", *R. S. Q.* 1941, *c.* 324, and answers to interrogatories she had propounded to Charles Coderre, Esquire, an attorney of the Quebec Bar, who qualified as an expert on Quebec Adoption Law. At argument before us, respondent had no objection or disagreement with the answers as given, nor did it offer to submit any contrary opinions by any other expert.

"An Act Respecting Adoption" *R. S. Q.* 1941 *c.* 324 amended by *S. Q.* 1950 *c.* 10 and amended by *S. Q.* 1960 *c.*

10 was the law concerning adoptions in force and effect at the time the adoption proceedings involving Frank, Jr. commenced and continued. Generally, a person or persons may adopt a child if they be at least 20 years of age and profess the same religion as the child. *R. S. Q.* 1941, *c.* 324, § 3. A petition is then filed in the Superior Court or in the Social Welfare Court of the district if one is established, and presented in chambers where it is taken and adjudged. *R. S. Q.* 1941, *c.* 324 § 7. The petition must be accompanied by the written consent of the institution which has custody of the child, *R. S. Q.* 1941, *c.* 324, § 8(1)(d), but no petition is to be granted for a child under the age of 14 unless it be shown that the child has lived for the two preceding years with the petitioner, and that during such period the conduct of the petitioner and the conditions in which the child lived have been good. The judge however is granted the discretion to authorize the adoption if it be established that the adoptor is a person of good conduct, capable of properly bringing up the child, and that during a period of residency of one year the child has been well treated by the adoptor and his family, *R. S. Q.* 1941, *c.* 324, § 13. In any event, the judge is required in every case to make a thorough inquiry into the moral qualities of the proposed adopting parents and their fitness to properly bring up the child and to furnish him with a home. If their qualifications to fulfill their obligations and duties as parents are deemed adequate, a judgment of adoption is rendered upon a finding that adoption is in the best interests of the child. *R. S. Q.* 1941, *c.* 324, § 12.

Once a judgment of adoption is rendered, a new birth certificate is issued at the registry of civil status in the district wherein the child is domiciled and it, together with the certificate of judgment, is transcribed upon the register of Civil Status. *R. S. Q.* 1941, *c.* 324, §§ 25 and 26.

Under *R. S. Q.* 1941, *c.* 324, §§ 16, 17, 18, the effects of a judgment of adoption are far reaching. The institution which placed the child for adoption loses custody of the child and is relieved of all legal obligations concerning him. The adopted

child assumes a relationship with the adoptive parents as he would as their natural child in respect to the obligations of support and maintenance and in respect to parental custody and obedience. The child becomes an heir of both adoptive parents although he does not succeed to the property of those related or "allied" to his adopting parents. So too, his property devolves to the adopting parents as would it had he been a natural child born in lawful wedlock.

Two provisions of the Quebec statute have particular applicability to the facts presented here. *R. S. Q.* 1941, *c.* 324, § 3 provides that a widow or widower may adopt a child of a different sex provided that a *de facto* adoption took place prior to the decease of the consort. In such a situation, the normal requirement that the husband or wife of the petitioner must join in the petition for adoption is inapplicable under *R. S. Q.* 1941, *c.* 324, § 5 but *the adopted child shall be considered to be the child of both.*

Here, as a widow under *R. S. Q.* 1941, *c.* 324, § 3, Mrs. Stellmah petitioned the Social Welfare Court of Montreal under *R. S. Q.* 1941, *c.* 324, § 5 to adopt Frank, Jr. and the judgment rendered on September 11, 1961 stated that the child was adopted and should be considered to be the child of both Laila M. Smull Stellmah and Frank M. Stellmah, Sr. The question thus presented is whether the judgment dated September 11, 1961 relates back to the date that the custody papers were signed—February 29, 1960—so that the child would have been "legally adopted" under *N. J. S. A.* 34:15–13 (g) as of the date of his adoptive father's death, June 26, 1961.[2]

As indicated, no appeal from a judgment of adoption is permitted, nor is any record of the proceeding in the chambers of the Social Welfare Court kept, except the copy of the adoption judgment and the newly issued birth certificate.

[2] An example of this concept of relation back of the effective date of a judgment of adoption is the French Civil Law which provides that the effective date of the adoption is the date of the consent agreement. See, *Comparative Analysis of Adoption Laws, op. cit. supra, p.* 8.

Thus, case interpretations of the Adoption Act are nonexistent. A Civil Law province does not follow and is not bound by the principle of *stare decisis,* for each case is decided upon the merits of the parties' contentions in respect to the guiding principles of the Civil Code. Thus, a noted legal writer's work explaining and interpreting particular parts of legislation is generally the most authoritative source of a Code or statute interpretation. *McWhinney, Canadian Jurisprudence* (1958), *pp.* 70–89, and *Castel, The Civil Law System of the Province of Quebec* (1962), *pp.* 218–245.

Petitioner's expert was of the opinion that the judgment of adoption dated September 11, 1961 did relate back in time to the one year's end so that the child, Frank, Jr. would therefore be considered legally adopted under Quebec Law as of the date of Frank M. Stellmah, Sr.'s death. Moreover, he opined once the one-year period expired, the child would be *de facto* adopted and this status would be recognized as existing from the date of the contract. He also stated that had a similar situation arisen in Quebec the child would have been entitled to death benefits as a legally adopted child under the Quebec Workmen's Compensation Act.

He explained the legal effect of a *de facto* adoption. Prior to 1924, adoptions were unknown in Quebec with the exception of so-called *de facto* adoptions which had a purely social or charitable character. Trudel, "Clinique sur L'adoption de Enfants Legitimes," 24 *Revue du Barreau de la Province De Quebec* 31 (1965); Kennedy, "The Legal Effects of Adoption," 33 *Can. B. Rev.* 751, 752 (1955); see *Roch, L'Adoption dans la Province De Quebec* (1951), § 2, *p.* 25. Thus, a child's natural parents, even when consent to the adoption had been given, could regain custody of their child at any time. So too, the adoptive father could not obtain damages for the wrongful death of the child under Article 1056 of the Civil Code. Mayrand, "Adoption et Successibilité," 19 *Revue du Barreau de la Province de Quebec* 409, 412 (1959).

However, this did not mean that the *de facto* adoptions had no jural effect. While a member of the adoptive father's

home, the child was required to turn over all his income to the family and be obedient to the adoptive parents as would a natural child. The parent could claim exemptions for the *de facto* adopted child under both the revenue and inheritance tax laws even though the term "adopted child" was used in the exemption provisions. Additionally, when a testator bequeathed a gift to "my adopted children," a *de facto* adopted child was considered in the class of "adopted children" under Quebec Civil Code, Articles 1053, 1064; *Roch*, § 20, *pp.* 159–160 citing *Allard v. Lemlin,* 1942 *C. S., p.* 79; Mayrand, "Adoption et Successibilité," 19 *Revue du Barreau de la Province De Quebec* 409 (1959).

The Adoption Act, *R. S. Q.,* 1941, *c.* 324, § 6.6, refers to *"de facto* adoption" in providing for the adoption of a person who has obtained the age of majority. This type of adoption is established by certain facts clearly indicating a relationship equivalent to that created by a legal adoption between the child and the persons who desire to adopt him legally, *i. e.,* the signing of a consent agreement, supporting the child as their own and providing for his education. The period of time required for such a child to obtain the status of a *de facto* adopted child is the same as the residency custody provisions of the Adoption Act. *Roch*, § 7, *pp.* 61–67.

Petitioner's expert stated that under the Adoption Act, the judgment rendered in this case is called a posthumous adoption and has the effect of granting the child the status of a legally adopted child to both foster-parents with all the legal consequences and effects. He also stated that a *de facto* adoption has the effect of granting to this relationship, prior to the entry of the formal judgment of adoption, certain jural effects aimed at accomplishing that which should have been accomplished but for the parent's death.

He testified that all these principles are aimed at providing for the welfare of the child. For these reasons he concluded that under Quebec Law Frank M. Stellmah, Jr. would be considered the legally adopted son of Frank M. Stellmah,

Sr. as of June 26, 1961, the date of his death, for purposes of providing for the child's welfare.[3]

We agree with these conclusions. We are satisfied that under Quebec law Frank M. Stellmah, Jr. had acquired the status of an adopted child of Frank M. Stellmah, Sr. as of the date of his death and therefore is one of the enumerated dependents included in *N. J. S. A.* 34:15–13(g). As such, he is to be considered as one of the dependents of Frank M. Stellmah, Sr. in determining the death benefits and the distribution thereof. *N. J. S. A.* 34:15–13(c).

Reversed.

*For reversal*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO.—6.

*For affirmance*—None.

---

[3] For authorities on Quebec Law, see *Castel, The Civil Law System of the Province of Quebec* (1962); *McWhinney, Canadian Jurisprudence* (1958); *Roch, L'Adoption dans la Province De Quebec* (1951); Trudel, "Clinique sur l'adoption de enfants legitimes," 25 *Revue du Barreau de la Province De Quebec* 31 (1965); Mayrand, "Adoption et Successibilete," 19 *Revue du Barreau de la Province De Quebec* 409 (1959); Kennedy, "Adoption In The Conflicts of Laws," 34 *Can. B. Rev.* 507 (1956); Kennedy, "The Legal Effects of Adoption," 33 *Can. B. Rev.* 751 (1955). See, generally, *Comparative Analysis of Adoption Laws* (1956), *United Nations Department of Economic and Social Welfare.*