705 A.2d 1279

IN RE ADOPTION OF BABY T.

Superior Court of New Jersey
Chancery Division
Family Part
Camden County

Decided September 17, 1997.

active lawsuit outside the presence of that dissident member. *See* 251 *N.J.Super.* at 568, 598 *A.2d* 1232.

*David M. Fried,* for plaintiff, (*Blume, Goldfaden, Berkowitz, Donnelly, Fried & Forte,* attorneys).

*Lauren O'Neill,* for Irwin Krasna (*Post, Polak, Goodsell & MacNeill,* attorneys).

*Marie Judith McCormack,* for Nishat Zedie (*Dughi & Hewit,* attorneys).

*Sheila Glackin,* for Robert Wood Johnson University Hospital (*Lynch, Martin, Philibosian, Chansky, Fitzgerald & Kane,* attorneys).

COOK, J.S.C.

### *INTRODUCTION*

In what appears to be an issue of first impression in New Jersey, this court is asked to set aside a final judgment of adoption entered more than two years ago, on grounds that four months after the birth of the adoptive child, Baby T., and the voluntary surrender of all parental rights by his birth mother [1], as

---

[1] The biological father died before the child was born.

well as four months after the child was lawfully placed in the custody of his adoptive parents by a State-approved and licensed adoption agency, the child unexpectedly died prior to the final hearing on his adoption. The motion to vacate the adoption is brought not by the adoptive parents nor any other party to the adoption proceeding. Rather, Dr. Nishat Zedie, a defendant in a separate medical negligence action, and at whose hands the death of Baby T. is alleged to have occurred, is the one who now seeks to invalidate his adoption. Dr. Zedie had no relationship to Baby T., except as the physician who allegedly administered the wrong anesthesia agent to him, in conjunction with what was to be same-day surgery for repair of a left inguinal hernia, as a result of which Baby T. met a premature and unexpected death.

On July 7, 1995, the adoption hearing was held and the final judgment of adoption of Baby T. by Peter and Janet Hyman was entered, upon full disclosure to the court by the adoption agency and the adoptive parents of the child's unexpected, premature death. Also before the court at the adoption hearing was a letter from the State licensing bureau for adoption agencies. In that letter, the State adoption agency licensing bureau acknowledged Baby T.'s unexpected death and his adoptive parents' desire for closure and finalization of his adoption. The Bureau gave its approval, waiving the requirement that a child reside in the home of his or her adoptive parents for six months, and authorized the adoption agency ("Adoptions From the Heart") to consent to the adoption of Baby T., without risk of loss of its license nor citation for any violation of adoption licensing standards or regulations.

For the reasons expressed herein, it is this court's determination that given the particular facts and circumstances of this case, viewed in the light of those legal and equitable principles that bear on this application, the posthumous judgment of adoption of Baby T. by the Hymans is valid, and should not now be set aside.

## STANDING

Preliminarily, there is the threshold question whether the movant-physician who is alleged to have negligently caused the

adoptive child's death has any standing to challenge the adoption judgment. Seeking to vacate what is now a two-year old judgment of adoption as being void, Dr. Zedie relies on *R.*4:50. However, the rule provides relief only to *a party to the judgment, or the party's legal representative. R.*4:50-1, 2. The movant was not a party to the adoption judgment she now seeks to vacate; therefore *R.*4:50 does not confer standing nor afford her a basis for relief. Movant's further reliance on *In re Adoption of Children by O.*, 141 *N.J.Super.* 586, 359 *A.*2d 513 (Ch.Div.1976), is likewise misplaced. That case involved a motion to vacate a judgment of adoption brought by a party to the adoption proceeding, the adoptive father. Here, Dr. Zedie was literally a stranger to the adoption proceeding that she now attacks. Thus, there are serious questions whether Dr. Zedie has standing to challenge the judgment of adoption. Certainly Dr. Zedie did not suffer any direct injury from the adoption of Baby T. It is also clear that Dr. Zedie's primary, if not sole, motive and interest in seeking relief at this late date is to avoid the potential liability she may be exposed to in the wrongful death and survival action that has been brought against her by reason of the child's death. However, assuming *arguendo* that movant has standing to seek to vacate the judgment of adoption by applying a most liberal interpretation of the New Jersey test for standing, the court will address the substantive issue. *See Patrolmen's Benev. Ass'n v. East Brunswick Tp.*, 180 *N.J.Super.* 68, 72–73, 433 *A.*2d 813 (App.Div.1981) (addressing the substantive issue raised by a plaintiff whose standing was questionable). In doing so, this court has jurisdiction to entertain the motion, and is cognizant of its power to control, vacate or correct its own judgments. *Wilford v. Sigmund Eisner Co.*, 13 *N.J.Super.* 27, 33, 80 *A.*2d 222 (App.Div.1951); *In re T*, 95 *N.J.Super.* 228, 235, 230 *A.*2d 526 (App.Div.1967); *In re Adoption of Children by O.*, 141 *N.J.Super.* 586, 589, 359 *A.*2d 513 (Ch.Div.1976); *In the Matter of Adoption of G.*, 89 *N.J.Super.* 276, 280, 214 *A.*2d 549 (Cty.Ct.1965). This is not to say, however, that the interests of an outsider to the adoption, as Dr. Zedie is, should be considered in determining whether the adoption judgment

should be set aside. *In re Adoption of G., supra,* 89 *N.J.Super.* at 281, 214 *A.2d* 549. Neither can the importance of the finality of judgments be ignored, nor the principle that relief in the form of vacation of a final judgment should be granted only on the presentation of "truly exceptional circumstances", as determined by the particular facts of each case. *See Baumann v. Marinaro,* 95 *N.J.* 380, 395, 471 *A.2d* 395 (1984).

### THE ADOPTION OF BABY T.

Turning to the substantive issue, namely the validity or invalidity of the judgment of adoption of Baby T., the salient facts of record regarding the child, his biological and adoptive parents, his placement for adoption, his premature death and the adoption process itself, are as follows.

Baby T. was born on December 1, 1993. He was a full-term, healthy baby, weighing over 7 pounds. His biological father predeceased Baby T.'s birth by several months. On December 4, 1993, three days after his birth, Baby T.'s biological mother voluntarily relinquished all her parental rights and custody of the child to Adoptions From The Heart, an adoption agency licensed and approved by the State of New Jersey. She executed a notarized formal document, therein acknowledging the termination of all her parental rights, and consenting to the adoption of Baby T. by a person or persons approved by the adoption agency. Under New Jersey adoption laws, this surrender constituted a valid and complete relinquishment of the biological mother's parental rights and custody rights, and signified her consent to the adoption of Baby T. *N.J.S.A.* 9:2–16 and 17; *N.J.S.A.* 9:3–41 (surrender of child to approved adoption agency and relinquishment of custody and parental rights). In its subsequent report to the court, the adoption agency noted that the biological father predeceased Baby T.'s birth, and that the biological mother was unable to raise the child.

That very day, December 4, 1993, Baby T. was committed to the custody of the adoption agency, and he was also placed by the

approved adoption agency that day in the home of his adoptive parents, Peter and Janet Hyman. The Hymans were married in 1984 and had previously adopted another son in 1988. Mr. Hyman was a business executive and Mrs. Hyman was a full-time mother and homemaker. They had been selected by Baby T.'s biological mother, through Adoptions From The Heart, to adopt the child.

Baby T. remained in the Hyman family home under their continuous care and nurture from the time of his placement until his premature and unexpected death on March 31, 1994, a period of almost four months.

As noted, it is alleged in the separate action that on March 31, 1994, Dr. Nishat Zedie, who now seeks to void Baby T.'s adoption, negligently caused his death by administering the wrong anesthesia for what was to be same-day surgery for repair of an inguinal hernia. Documenting that allegation is the uncontroverted submission by Mr. Hyman on this motion of the report of Dr. Sheldon Deluty, M.D., outlining various deviations by Dr. Zedie from accepted standards of practice in her treatment of Baby T. These deviations included the improper use of an anesthetic that had been expressly mandated by the FDA as *contraindicated* for use in children. As a result, Baby T. suffered cardiac arrest and died several hours later. Dr. Deluty's report is uncontroverted by any medical expert report of record.

After Baby T.'s untimely death, Mr. and Mrs. Hyman, with the consent of the adoption agency, took the responsibility for all funeral arrangements and expenses for Baby T., and made those arrangements as his parents. In his certification opposing Dr. Zedie's motion, Mr. Hyman states:

> On or about December 4, 1993, my wife, Janet and I brought our newly born son, [Baby T], home to live with us. At that time, we knew there was a six (6) month waiting period to file an adoption Complaint and to obtain an Order of Adoption. On March 31, 1994, our son died during a hernia repair operation.
>
> We buried our son in our family cemetery plot. He died as our son and was buried with the name we gave him, [the full name given Baby T].

Although the child died unexpectedly prior to a final hearing on his adoption, Mr. and Mrs. Hyman wanted to complete the adop-

tion of Baby T. for purposes of finality and closure. They considered him as their son. Mr. Hyman further states in his certification:

> On July 5, 1995, we obtained an Order of Adoption. This was important to us to know our son died as a member of our family, he was not an orphan and we, as his parents, and our other children, as his siblings, take comfort knowing [Baby T] is buried in our family cemetery plot.
>
> We asked the Court to approve the adoption, and we incurred all of the requisite fees for the adoption, so that our son was properly buried as a legitimate member of our family, as he was in life.

The Hymans paid adoption agency placement fees of $8,612.50 in conjunction with Baby T.'s placement with them. Further indicative of their dedication to adoption, Mr. and Mrs. Hyman, who had previously adopted their oldest son in 1988, not only filed the complaint for final hearing on Baby T.'s adoption, but for the adoption of a third child as well. Thus, the judgment of adoption that Dr. Zedie now seeks to set aside granted the adoption of two children, Baby T. and Baby A.

Following Baby T.'s death, the adoption agency requested guidance and permission to consent to the finalization of Baby T.'s adoption from the Bureau of Adoption Agency Licensing of the New Jersey Division of Youth and Family Services ("DYFS"). The State adoption agency licensing bureau waived the six-month supervision requirement and gave its approval for Baby T.'s adoption in the following letter, issued on November 4, 1994, some seven months after Baby T.'s unexpected death:

> The Bureau of Licensing has been informed of the above adoptive parent's desire to finalize the adoption of their son. The Agency provided four months of supervision prior to the unexpected death of the child.
>
> As you know the adoption law in New Jersey requires six months of supervision prior to the finalization of an adoption. However, in consideration of the circumstances involved with this case and the family desire to apply closure to the adoption, the Bureau of Licensing will not cite as a violation the agency's consent to the adoption of the child with four months of supervision.
>
> If there are any questions, please feel free to contact my office at [telephone number].
>
>> Sincerely,
>> Richard Danback, Assistant Chief
>> Adoption Agency Licensing
>> Bureau of Licensing

With this approval in hand, the adoption agency, Adoptions From The Heart, then submitted its consent to the adoption of Baby T., in accordance with *N.J.S.A.* 9:3–47(a). The agency's consent to adoption accompanied the Hyman's verified complaint for adoption. The adoption agency also submitted its report to the court recommending approval of the adoption of Baby T. In that report, the agency advised the court that it was highly impressed with the parenting ability of the Hymans throughout the months that Baby T. was with them, noting that he had developed into a happy and well adjusted baby in the Hyman household, where he was a much wanted and well loved child.

In the adoption complaint, and at the adoption hearing as well, there was full disclosure by the Hymans of the fact of Baby T.'s untimely death. That fact was also made known to the court in the adoption agency's report. Also before the court at the July 7, 1995 final hearing on Baby T.'s adoption was the November 4, 1994 letter approval from the State adoption agency licensing bureau, which noted the occurrence of Baby T.'s unexpected death prior to the final hearing and at the age of four months, and waived the 6–month supervision requirement.

The court was satisfied at the final hearing that based upon the verified complaint and the evidence presented, including the letter of the State adoption agency licensing bureau, along with the adoption agency's report, that the best interests of Baby T. would be promoted by approving his adoption by the Hymans. Accordingly, a judgment of adoption was entered on July 7, 1995. *N.J.S.A.* 9:3–47(d). The adoption judgment formally established the same relationships, rights and responsibilities between Baby T. and his adoptive parents, Peter and Janet, as if he was born to them in lawful wedlock. *N.J.S.A.* 9:3–50(b).

### THE LEGAL AND EQUITABLE PRINCIPLES THAT BEAR UPON AND VALIDATE THE ADOPTION OF BABY T.

When considering the validity of the judgment of adoption of Baby T., it should be borne in mind that in reviewing any

adoption judgment, a family court must consider not only the adoption statutes, cases and other written authority, but also its inherent equitable powers as a court of chancery. Indeed it has been said that family courts, being courts of equity:

> ... have reflected the collective public conscience of what should and should not be done. Equity involves the obedience to dictates of morality and conscience. The morality of which equity speaks is that of society and not the judge's personal view of right and wrong. Likewise, equity may not disregard statutory law but looks to its intent rather than its form. *In re Quinlan,* 137 *N.J.Super.* 227, 348 *A.2d* 801 (Ch.Div.1975), mod., remanded other grounds 70 *N.J.* 10, 355 *A.2d* 647 (1976).
>
> [*Sheridan v. Sheridan,* 247 *N.J.Super.* 552, 558–59, 589 *A.2d* 1067 (Ch.1990).]

Through its equity or chancery jurisdiction, a family court possesses the sovereign power of *parens patriae.* Pursuant to its *parens patriae* power and jurisdiction, a family court always is charged with protecting the interests of the children. *Matter of Adoption of a Child by McKinley,* 157 *N.J.Super.* 293, 384 *A.2d* 920 (Ch.Div.1978); Hon. Robert Page, *Family Courts: An Effective Judicial Approach to the Resolution of Family Disputes,* 44 Juvenile & Family Court Journal 9–10 (1993). In addition, the requirement to find the legal basis for judicial action should not inhibit or unduly restrict a family court in the application of equitable principles. Hon. Robert Page, *Family Law Practice,* p. 2–2 (1991).

Further, when it comes to the adoption of children, the Legislature has mandated that the Adoption Act of New Jersey "shall be liberally construed to the end that the best interests of children be promoted," and "due regard shall be given to the rights of all persons affected by an adoption." *N.J.S.A.* 9:3–37. As the late Judge Clarkson Fisher put it, when, as here, a judgment of adoption of a child is attacked, "[T]he best interests and welfare of the child should be the paramount consideration of the court in any proceeding involving the status of an adoption." *In re Adoption of G.,* 89 *N.J.Super.* 276, 281, 214 *A.2d* 549 (Cty.Ct.1965).

It is not surprising then that motions to vacate adoption judgments have rarely been granted. Indeed, in any proceeding

involving the status of an adoption, not only are the best interests and welfare of the child the paramount consideration of the court, but the protection of the interests of the adopting parents is important as well. An adoption judgment should not be set aside unless it is in the best interests of the child, and the adoptive parents. *In re Adoption of Children by O.*, 141 *N.J.Super.* 586, 589, 359 *A.*2d 513 (Ch.Div.1976); *In the Matter of the Adoption of G.*, 89 *N.J.Super.* 276, 281, 214 *A.*2d 549 (Cty.Ct.1965). Indeed, it has been said that once a judgment of adoption has been entered, "[T]he new relationship between the adoptive parents and the child is so fixed that *there may be no interference from any outside source.*" *In re Adoption of G.*, supra, 89 *N.J.Super.* at 281, 214 *A.*2d 549 (emphasis added). Adoption judgments are so insulated against voidance that as the courts stated in *In re Adoption of O.*, 88 *N.J.Super.* 30, 36, 210 *A.*2d 440 (Cty.Ct.1965), and again in *In re Adoption of Children by O.*, supra, 141 *N.J.Super.* at 589, 359 *A.*2d 513: "Public policy dictates that there be very unusual facts and circumstances which would compel a court to set aside or revoke a judgment for adoption."

Thus, for example, in *In re Adoption of G.*, the court denied a motion by the adoptive parents to vacate the adoption of a child, who, after the adoption judgment was entered, was shown by tests to be mentally retarded and to require institutional care. The adoptive parents asserted that the financial burden and time necessary to care for the retarded infant would have an adverse effect on their other children. Dismissing that argument, the court held that the only parties whose interests should be considered on a motion to vacate an adoption judgment are the adoptive parents and the adoptive child. *In re Adoption of G.*, supra, 89 *N.J.Super.* at 279, 281, 214 *A.*2d 549.

The rare instance where an adoption judgment has been set aside is typified by the most unusual facts and circumstances of *In re Adoption of Children by O.*, supra. There, the adoption of three children was vacated because shortly after the adoption judgment was entered, the mother deserted the adoptive father

and took the children with her. The children never saw the adoptive father, did not know him or know that he was their father. They never used his name. The adoptive father secured a divorce on grounds of desertion. Both the mother and adoptive father wanted to sever all ties with each other and to have the adoption set aside. He wanted no contact with the children. The court noted that vacating the adoption was in the children's best interests, for they did not know the adoptive father, they never used his name, and it would have been most unsettling for them to go through life with the name of a man who was not their natural father, and who they did not even know. 141 *N.J.Super.* at 590, 359 *A.*2d 513.

In an analogous situation involving the unexpected death of a prospective adoptive father prior to the final hearing on adoption, the Supreme Court held in *Stellmah v. Hunterdon Coop. G.L.F. Service, Inc.,* 47 *N.J.* 163, 219 *A.*2d 616 (1966), that the child would nonetheless be considered "legally adopted" under *N.J.S.A.* 34:15–13(b), for purposes of dependency and entitlement to worker's compensation benefits for the work-related death of his adoptive father. In that case, custody of the child had been placed with the prospective adoptive parents by an adoption agency in Quebec. The child was then brought to New Jersey by his prospective adoptive father and mother. A one year probationary period was required before application to the Quebec court for a judgment of adoption [2]. However, the prospective adoptive father died as a result of an industrial accident, before any application for a judgment of adoption was submitted. It was not until after the death of the prospective adoptive father that adoption proceedings were initiated in Quebec. Thereafter, a posthumous judgment of adoption of the child by the prospective adoptive father was entered, even though the father had predeceased the filing of the

---

[2] In New Jersey, the corresponding period for a child placed by an approved agency is six months. *N.J.S.A.* 9:3–47(a). As previously noted, the State adoption agency licensing bureau waived the six-month agency supervision period in this case.

application for adoption, as well as the adoption hearing and the entry of the adoption judgment. The posthumous adoption judgment was recognized by the Supreme Court, and the child's entitlement to worker's compensation death benefits was upheld, without any criticism or question being raised by the Supreme Court as to of the adoptability of a child by a parent who predeceases the filing of the complaint for adoption, the adoption hearing and the entry of the judgment of adoption.

■ Applying the rationale of *Stellmah,* including the Supreme Court's recognition of "the public policy of this State in respect to the welfare of adopted children ...," *Id.* at 174, 219 *A.*2d 616, the result here should be no different. In this case, Baby T. had been with his prospective adoptive parents almost four months. No one expected his death would occur when it did. It was unexpected and untimely, to say the least. Based on the record in this case, Baby T. would have survived and remained alive had he been given proper anesthesia. Moreover, the State adoption agency licensing bureau waived the requirement of six months of adoption agency supervision prior to the finalization of an adoption. The adoption agency also consented to the adoption. Furthermore, the New Jersey Adoption Act does not specify that an adoptive child whose biological parents have surrendered all parental rights and who has been properly placed with his or her adoptive parents by a State-licensed and approved adoption agency, must in all cases survive until the entry of final judgment. Indeed, to hold otherwise in this instance, where the child's death was premature and unexpected, and the completion of the six-month placement period was thwarted by the alleged malpractice of the very person who seeks to vacate the adoption, would be contrary to the spirit and intent of the Adoption Act. Clearly, when the Legislature mandated that the Adoption Act of New Jersey "shall be liberally construed to the end that the best interests of children be promoted" (here Baby T.), and that "[d]ue regard shall be given to the rights of all persons affected by an adoption" (here Mr. and Mrs. Hyman), it did not intend a result in this case that would void

Baby T.'s adoption, allow him to have died an orphan, and immunize Dr. Zedie against the consequences of her alleged dereliction in causing his death. Further, for Dr. Zedie to now argue, as she does, that the adoption of Baby T. has enabled the Hymans to qualify as his heirs and bring a wrongful death and survival action for Baby T.'s death is of no moment; for in *Stellmah,* so did the adoption of a child by a deceased father enable the child to qualify for receipt of worker's compensation benefits by payable on account of the father's work-related death.

▉ The judgment of adoption of Baby T. can also be validated through the application of equitable principles as well, including the doctrine of equitable adoption. Under the latter doctrine, courts have recognized that when equity and justice so requires, where there has been at least an agreement by prospective parents to adopt, and faithful performance to that end by the adoptive parties, but an adoptive parent dies before the final adoption hearings, the adoption will be enforced. In such instances, the child occupies in equity the status of an adopted child, with full right of inheritance as though a natural born child. *See, D'Accardi v. Chater,* 96 *F.*3d 97 (4th Cir.1996) (discussing and applying the New Jersey cases recognizing the doctrine of equitable adoption). Moreover, the Supreme Court of Nevada in *Bower v. Landa,* 78 *Nev.* 246, 371 *P.*2d 657, 94 *A.L.R.*2d 1232 (1962), while acknowledging there are authorities to the contrary (*Smith v. Atlantic Coast Line R. Co.,* 212 *S.C.* 332, 47 *S.E.*2d 725 (1948); *Weems v. Saul,* 52 *Ga.App.* 470, 183 *S.E.* 661), held that there was no justification for refusing to extend the principles of equitable adoption so as to entitle the subject of such an adoption to maintain an action for the wrongful death of his adoptive parents. Determining that the right of an equitably adopted child to bring a wrongful death action was paramount to the rights of the decedent's surviving siblings, the court noted that the child would in legal effect become the decedent's heir by virtue of the equitable adoption, and that the word "heirs" in the wrongful death statute included any persons entitled to inherit the decedent's estate. 78

*Nev.* at 252–53, 371 *P.*2d at 660. *See also, Annotation, Modern Status of Law As To Equitable Adoption or Adoption By Estoppel,* 97 *A.L.R.*3d 347, 369.

The movant, Dr. Zedie, erroneously asserts that the doctrine of equitable adoption is not recognized in New Jersey. She relies solely on *Matter of the Adoption of a Child by N.E.Y.,* 267 *N.J.Super.* 88, 630 *A.*2d 835 (Ch.Div.1993), for this proposition. *N.E.Y.* involved a private placement adoption, not an approved agency placement as in this case. The prospective adoptive parent, *N.E.Y.,* died after the preliminary hearing required in private placement cases, but before the final hearing. Thereafter, a motion was filed on the adoptive child's behalf for an order finalizing the adoption. Recognizing that "the best interest of the child is the paramount test in the highly sensitive area of adoption", *Id.* at 95, 630 *A.*2d 835, the court nonetheless rejected finalization of the adoption. In doing so, the court twice said that the doctrine of equitable adoption or adoption by estoppel has not been recognized in New Jersey. *Id.* at 95–96, 630 *A.*2d 835. That observation in *N.E.Y.* was later called into question in *D'Accardi v. Chater, supra,* 96 *F.*3d 97 (4th Cir.1996). Applying New Jersey law and the doctrine of equitable adoption, the *D'Accardi* court noted:

> We are at a loss to explain the assertion by the New Jersey Superior Court that "New Jersey has not recognized 'equitable adoption' in any case that research has disclosed." *In re: the Adoption of a Child by N.E.Y.,* 267 *N.J.Super.* 88, 603 [630] *A.*2d 835, 839 (1993) (ruling that the court had no authority under statute or case law to use the theory of equitable adoption to finalize a decree of legal adoption for purposes of favorable inheritance tax treatment and Social Security benefits).

> [*Id.* at 100 n. 5.]

The *D'Accardi* court stated further that:

> There is no dispute that the law of the State of New Jersey applies to this case as Robert D'Accardi was a New Jersey resident at the time of his death. New Jersey recognizes the doctrine of equitable adoption as a theory of inheritance under intestacy:

>> It is now firmly established that an oral agreement to adopt, where there has been a full and faithful performance on the part of the adoptive child, but which was never consummated by formal adoption proceedings during the life of the adoptive parent, will, upon the death of the latter, and when equity and justice so

> requires, be **enforced to the extent of decreeing that** *such child occupies in equity the status of an adopted child,* entitled to the same right of inheritance from so much of his foster parent's estate that remains undisposed of by will or otherwise, as he would have been had he been a natural born child.
>
> *Burdick v. Grimshaw,* 113 *N.J.Eq.* 591, 168 *A.* 186, 188 (Ch.1933); *see also Ashman v. Madigan,* 40 *N.J.Super.* 147, 122 *A.*2d 382, 383 (Ch.Div.1956) (finding that statements and conduct of decedent demonstrated the existence of an enforceable agreement to adopt); *Hendershot v. Hendershot,* 135 *N.J.Eq.* 232, 37 *A.*2d 770, 772 (Ch.1944) (ruling that testator made binding oral argument to adopt, which gave complainant the status of a legally adopted child for inheritance purposes).
>
> [*Id.* at 100 (emphasis added).]

Thus, the observation in *N.E.Y.* that New Jersey does not recognize the doctrine of equitable adoption appears at odds with the above-cited decisions.

For instance, as quoted in *D'Accardi,* the New Jersey Chancery court in *Burdick v. Grimshaw,* recognized and applied the doctrine of equitable adoption. 113 *N.J.Eq.* at 595, 168 *A.* 186. In applying the doctrine in a case involving a potential adoptive parent who died prior to the consummation of an adoption, the court found that there was no evidence of an agreement to adopt, and accordingly denied plaintiff's request for an inheritance. *Id.* at 602, 168 *A.* 186.

In *Hendershot v. Hendershot,* 135 *N.J.Eq.* 232, 37 *A.*2d 770 (Ch.1944), The court was faced with a similar situation in which a child sought to be declared the adopted son of his stepfather who had made an oral agreement to adopt him. Relying on *Burdick,* the court held that the specific performance of an agreement to adopt will be enforced if wholly or partially performed. *Id.* at 237, 37 *A.*2d 770.

In *Ashman v. Madigan,* 40 *N.J.Super.* 147, 122 *A.*2d 382 (Ch.Div.1956), the court reached a similar conclusion, finding that there was sufficient evidence in the statements and conduct of the adopting parent to furnish clear and satisfactory proof that an agreement of adoption must have existed. 40 *N.J.Super.* at 150, 122 *A.*2d 382.

In interpreting and applying New Jersey law, the court in *D'Accardi, supra,* held that New Jersey courts will apply the

doctrine of equitable adoption in appropriate circumstances. In that case, adoption proceedings had been initiated, but the potential adoptive parent had a change of heart on his deathbed and requested that the adoption be discontinued. *Id.* at 99. The petitioners sought social security survivor insurance benefits as the equitably adopted children of the decedent. The Social Security Commissioner denied their claim. On appeal, the Fourth Circuit Court of Appeals held that New Jersey recognizes the doctrine of equitable adoption as a theory of inheritance under intestacy, citing *Burdick, Hendershot* and *Ashman.* Quoting *Burdick, supra,* the court noted that under the doctrine of equitable adoption, ". . . the child occupies in equity the status of an adopted child . . ." *D'Accardi, supra,* 96 *F.*3d at 100. The court applied the doctrine of equitable adoption in authorizing the child's entitlement to social security benefits upon the death of the prospective adoptive parent, even though no adoption was ever consummated by formal adoption proceedings. *Id.* at 101.

■ Arguing that a court cannot enter a judgment of adoption of a child who dies before the final hearing, the movant cites *In re Adoption of Bradfield,* 97 *N.M.* 611, 642 *P.*2d 214 (1982). In *Bradfield,* a trial court entered a final decree of adoption of a child who died prior to final hearing, and later vacated the final decree. The child's death allegedly was caused by medical malpractice. The New Mexico Court of Appeals upheld the vacation of the final decree of adoption with the broad, sweeping statement that never in any circumstances can there be a valid adoption of a child by a prospective parent who dies before the final order for adoption, nor can there ever under any circumstances be an adoption of a child who predeceases a final order of adoption.

This court does not subscribe to the inflexible view pronounced in *Bradfield.* To do so would not accord with the result reached by the New Jersey Supreme Court in *Stellmah.* Nor would it fairly take into account all the special facts and circumstances of this case that cry out for the invocation of the inherent equitable powers of this court to uphold the judgment of adoption of Baby

T. *Bradfield* fails to consider or even mention the equities of a particular case, instead slavishly adhering to an immutable rule requiring that no matter what the circumstances, all parties to an adoption must be alive at the time of the final decree. Under *Bradfield*, it would make no difference that a prospective adoptive child or parent met his or her premature death at the hands of the very person who would complain that no adoption decree should be entered. Under *Bradfield*, a person could cause the death of a prospective adoptive child or parent, thwart the adoption process, and thereby insulate himself or herself against a wrongful death action. Such a result cannot be squared with the result reached in *Stellmah*, nor with the doctrine of equitable adoption. *Bradfield* did not even discuss or consider that doctrine. Rather, the *Bradfield* court would bar adoption in the event of the death of either the child or parent prior to the final hearing, contrary to those decisions of courts in New Jersey and other jurisdictions that have recognized that under equitable adoption principles, a child may be considered to be adopted, even though the adoptive parent has predeceased the final hearing. And, as the Nevada Supreme Court held in *Bower, supra*, equitable adoption principles have been applied to permit the maintenance of a wrongful death action for the death of a prospective adoptive party, where such death occurred prior to a final adoptive decree. *Bower, supra*, 78 *Nev.* at 252–53, 371 *P.*2d at 660.

In summary, *Bradfield* is rejected as not representing an equitable and enlightened view, and it will not be followed by this court. The proper view is represented by the result in *Stellmah*, as well as in the *Bower, D'Accardi, Burdick, Hendershot* and *Ashman* decisions, *supra*. It is also codified in a 1990 amendment to the Utah adoption statute, Section 78–30–14(7), Utah Code Annotated. That amendment provides for the entry of a final decree of adoption upon the request of the adoptive parents where, as here, the child dies prior to the expiration of a period of six months residence in the adoptive parents' home.

In summary, in considering Dr. Zedie's motion to vacate the judgment of adoption of Baby T., this court should apply the spirit and intent along with the letter of the Adoption Act, the legal principles governing the vacating of adoption judgments and its own equitable and *parens patriae* powers, to the particular facts here surrounding Baby T.'s life, his death and his adoption. The best interests and welfare of Baby T. should be a paramount consideration, and the adoption laws should be liberally construed to the end that Baby T.'s best interests are protected. His physical death, allegedly at the hands of Dr. Zedie, should not also be the death knell for his best interests. In addition, due regard must be given to the rights of his adoptive parents, Peter and Janet Hyman. *N.J.S.A.* 9:3–37; *Matter of Adoption of a Child by McKinley, supra; In re Adoption G., supra; In re Adoption of Children by O., supra.* Further, under the guiding principles of those two decisions, the adoption of Baby T. should not be set aside unless it is in the best interests of him, and his adoptive parents. Nor should consideration be given to the interests of Dr. Zedie in vacating the relationship between Baby T. and his adoptive parents, for there should be no interference with the relationship by an outside source. *In re Adoption of G., supra.* Rather, "[p]ublic policy dictates that there be very unusual facts and circumstances which would compel a court to set aside or revoke [the] judgment of adoption" of Baby T. *In re Adoption of Children by O., supra,* 141 *N.J.Super.* at 589, 359 *A.2d* 513.

I do not find that Dr. Zedie has presented "very unusual facts and circumstances" sufficient to justify the setting aside of the judgment of adoption of Baby T. The movant does not assert nor document any fraud by the Hymans in procuring the adoption judgment. Rather, it is uncontroverted that the death of Baby T. was disclosed to the court at the time of final hearing, not only by the Hymans, but by the adoption agency, *and through the letter of the State Adoption agency licensing bureau.* Further, for more than two years now, Peter and Janet Hyman have been Baby T.'s legally recognized parents. Dr. Zedie should not now be permitted to effect the personal family decision of the Hymans to finalize

Baby T.'s adoption, so that she can avoid her potential responsibility for causing Baby T.'s death. Most important, Baby T. should not be compelled to have died an orphan, parentless and without family, all at the behest of someone whose alleged derelictions thwarted his survival until the final adoption hearing. He should not be allowed to be placed in some sort of legal limbo. Equity should not and cannot permit such a bizarre result in this case. Nor should Dr. Zedie be permitted to strike a mortal blow to the wrongful death and survival action pending against her, by seeking to vacate the adoption decree on grounds that Baby T. did not survive until the final hearing when, according to the uncontroverted record, she was the one who thwarted his survival in the first place. After all, if under equitable adoption principles, a child can sue for the wrongful death of his or her prospective adoptive parent as in *Bower, supra,* or receive worker's compensation benefits or social security benefits by reason of the death of his or her prospective adoptive parent, as in *Stellmah* and *D'Accardi, supra,* then where as here equity and justice so require, there is no valid reason why a parent should not be entitled to do likewise in the event of the death of the prospective adoptive child [3].

Accordingly, for each and all of the reasons expressed above, the motion of Dr. Zedie to vacate the final judgment of adoption of Baby T. by Peter and Janet Hyman will be denied.

---

[3] At oral argument, Dr. Zedie's counsel conceded that whether or not Baby T. was validly adopted, a survival action could be brought for his conscious pain and suffering prior to death. However, as Dr. Zedie's argument goes, Baby T.'s adoption was invalid, and so he died an orphan, and without any heirs to his estate. Dr. Zedie then concludes that all survival action damages would escheat to the State. Coincidentally, Dr. Zedie was at the time of her alleged malpractice an employee of the State.